United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 12, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-51225

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHELLE JIMENEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before BARKSDALE, STEWART, and CLEMENT, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendant-Appellant Michelle Jimenez ("Jimenez") appeals her convictions for conspiracy to possess with intent to distribute 500 grams or more, but less than five kilograms, of cocaine and aiding and abetting possession with intent to distribute that amount. Jimenez argues that the district court violated her Sixth Amendment right to confront and cross-examine witnesses by not allowing her to ask Government witness San Antonio Police Department Narcotics Unit Officer Valentine Lopez ("Lopez") where specifically he was located when he allegedly observed Jimenez selling drugs while on the front porch of her home. We find that Jimenez's rights under the Confrontation Clause were, in fact, violated by the district court's limitations on cross-examination; furthermore, we find

that the Sixth Amendment error was not harmless. Accordingly, we vacate Jimenez's convictions and remand for further proceedings.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jimenez was charged, along with her boyfriend, Juan M. Rodriguez ("Rodriguez"), in a two-count indictment with conspiracy to possess with intent to distribute 500 grams or more, but less than five kilograms, of cocaine and with aiding and abetting possession with intent to distribute the aforementioned amount of cocaine. Over Jimenez's objection at trial, the district court prohibited Jimenez from asking Lopez where specifically he was located when he observed what appeared to be Jimenez selling drugs. Based on his observations, Lopez obtained a search warrant for Jimenez's house. After the uniformed officers knocked on her door and identified themselves as police, they heard someone running toward the back of the house. When the officers forced entry into the house, they saw Jimenez running toward the kitchen at the back of the house and Rodriguez lying on a couch in the front room.

After she was *Mirandized*, Jimenez directed the officers to cocaine wrapped in aluminum foil in and under the stove in the kitchen, but the officers discovered cocaine in other locations on their own.[2] The officers found a total of 4,450.65 grams, or 9.79 pounds, of cocaine throughout the house – in the kitchen, in the bathroom, and in the living room. The officers testified that the amount of

---

[1] Jimenez also appeals the sentence rendered by the district court asserting that factors used in adding points to her base offense level were not presented to the jury. We do not reach Jimenez's *Booker* error issue. Our holding vacating Jimenez's convictions and remanding this case to the district court renders the *Booker* error issue moot.

[2] Jimenez testified that she told the officers the location of the drugs in the kitchen because she was certain about drugs being there. She stated that she knew there were more drugs in the house, but was not sure where Rodriguez kept them hidden.

2

cocaine found at the house was consistent with distribution. Furthermore, the officers' search revealed a large trash can in the kitchen containing items used to package and process cocaine, grinders, scales, packaging material, and tubs to mix the cocaine. No crack cocaine or items for its use were found in the house. The officers also found both an unloaded semi-automatic firearm in a purse and ammunition in the bathroom. Jimenez testified that she did not know there was a gun in the house. According to Lopez, Jimenez told him that there was a gun and cocaine in the bathroom and asked him not to tell Rodriguez that she had divulged the location of the cocaine. At trial, Jimenez testified that she was a crack cocaine user but that Rodriguez, who was staying with her at the house, was a drug dealer and that all of the drugs stashed throughout the house belonged to him.[3] She testified that she would leave when Rodriguez was cutting and packaging the cocaine. She denied having any role in producing or selling the drugs. She did admit that she had prior guilty-plea convictions for possession of cocaine and heroin, for which she spent five months in jail. She also testified that when she heard the officers at the door, she started running toward the back of the house, not in an effort to evade arrest, but to safeguard her two children who were in a bedroom near the back of the house. After hearing the testimony, the jury found Jimenez guilty on both counts. The district court sentenced Jimenez to 168 months of imprisonment and five years of supervised release, to be served concurrently. Jimenez filed a timely notice of appeal.

---

[3]Rodriguez's written statement taken on the day of the search and arrest was entered into evidence as Defendant's Exhibit Number 1. It was published to the jury and referred to in closing arguments. Sgt. Manuel Garcia testified that Rodriguez said he wanted to give a statement "so that his girlfriend wouldn't be involved." Rodriguez claimed sole responsibility for the cocaine. Rodriguez, however, did not testify at trial; testimony alluded to him having absconded to Mexico.

## II. DISCUSSION

### A. CONFRONTATION CLAUSE CLAIM

#### 1. Overview

Jimenez asserts the district court violated her Sixth Amendment right to confront and cross-examine witnesses by not allowing her to ask Lopez where specifically he was located when, as he testified, he observed her selling drugs outside of her home. Jimenez argues, and the record reveals, that Lopez was the only witness to testify that he saw Jimenez distributing drugs. She explains that because her cross-examination was limited by the district court, she could not test whether Lopez was in a position to see clearly the alleged drug transactions, whether there were any obstructions that impeded his view, or whether he fabricated his testimony. She contends that to assume, as the district court did, that Lopez would testify truthfully that he had an unobstructed view is to ignore the purpose of the Confrontation Clause. Finally, Jimenez argues that the denial of her right to test Lopez's credibility was not harmless error.

The Government argues that the district court did not abuse its discretion in limiting Jimenez's cross-examination of Lopez. It asserts that the question whether there were obstructions to Lopez's view was fully developed at trial. According to the Government, the district court noted correctly that the relevant question is not where Lopez was located, but whether there were obstructions in his line of sight. In the alternative, the Government argues that, given the strength of the evidence, any Sixth Amendment violation was harmless; even if Jimenez had established through cross-examination that Lopez's exact location was obstructed, there was overwhelming evidence that she conspired to possess cocaine with intent to distribute and aided and abetted the possession of cocaine with intent to distribute, as alleged in the indictment.

4

2. Standard of Review

"Alleged violations of the Confrontation Clause [of the Sixth Amendment] are reviewed *de novo*, but are subject to a harmless error analysis." *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004). If there is no Sixth Amendment violation, this court addresses whether the district court abused its discretion by limiting cross-examination. *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993).

3. Was There a Sixth Amendment Violation?

The Confrontation Clause guarantees a criminal defendant the right to cross-examine the witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 315 (1974). Indeed, it "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. The right to cross-examination "is particularly important when the witness is critical to the prosecution's case." *United States v. Mizell*, 88 F.3d 288, 293 (5th Cir. 1996). "[T]he cross-examiner is . . . permitted to delve into the witness' story to test the witness' perceptions and memory, [and] . . . has traditionally been allowed to impeach, i.e., discredit, the witness." *Davis*, 415 U.S. at 316. The right to cross examine, however, is not unlimited, but depends on the circumstances of the case. *Bigby v. Dretke*, 402 F.3d 551, 573 (5th Cir. 2005) (explaining that defendants are not guaranteed "cross-examination to whatever extent they desire"). Therefore, the only way we can accurately determine if Jimenez's Sixth Amendment right to confrontation was violated in this case is to turn to Lopez's trial testimony.

The record reflects that Lopez began his testimony on direct by explaining that he had received information from a long-time confidential informant regarding activities at 3602 Olive Street, Jimenez's residence. Lopez stated that as a result of these tips, he conducted surveillance and

5

observed several vehicles drive up and park at the front and side of Jimenez's house. He explained that, through binoculars, he observed individuals from these vehicles knocking on the front door and Jimenez answering the door; Lopez testified that he saw these individuals talk with Jimenez and hand her money. Thereafter, Jimenez went into her house, returned a short time later, and gave the individuals "something small." The individuals then left Jimenez's residence. Lopez testified that he observed these events transpire with approximately six different people over a thirty to forty-five minute period.

On cross-examination, defense counsel asked Lopez where he was stationed when he was conducting surveillance of Jimenez's house. Lopez refused to answer whether he had parked on Olive Street in front of the house or on the side street, and responded evasively to several questions that he "was parked close to the house where they couldn't see me." When Jimenez's counsel asked specifically on what street Lopez had been parked, the Government objected to Lopez answering the question, arguing that "it is going to attack the procedure used by the [San Antonio Police Department]."

Jimenez's counsel argued that he was testing Lopez's ability to see the activities to which he testified. The court instructed defense counsel to "[a]sk [Lopez] if he saw it." Jimenez's counsel explained that the goal was to illicit Lopez's vantage point in order to determine if he had a clear view of Jimenez's front porch. The court allowed counsel to ask only logistical questions, for example, if certain objects obstructed Lopez's view. Counsel asked Lopez whether there was a tree on the right side of the house on Olive Street, and Lopez could not recall whether there was. Lopez agreed that the front of Jimenez's house faces Olive Street and that the side of the house is on Regina Street.

6

Lopez also answered that he did not think Jimenez's front porch obstructed the view from Regina Street.

Thereafter, counsel asked Lopez whether he could not remember where he had parked or whether he was just not willing to tell; Lopez responded that he was not willing to tell. Defense counsel then asked again that the court instruct Lopez to reveal where he had parked. In response, the Government objected again, arguing that Jimenez's counsel could inquire as to how far Lopez was from the house, but that counsel could not ask Lopez about specific tactics. The court instructed counsel to ask Lopez how far he was from the house. Jimenez's counsel responded:

> Your Honor, with all respect to The Court. This goes to the heart of [the] confrontation clause. What is going on here is, he is refusing to my answer [sic]. Not that he doesn't know, not that he doesn't remember. But he is refusing to answer based on tactics. There is no privilege for tactics.

Thereafter, the court held a bench conference and asked the Government what harm would occur if Lopez provided his specific location. The Government again argued that the questions asked by Jimenez's counsel were protected because they involved police tactics. Therefore, the court asked Jimenez's counsel why the exact location was necessary; counsel responded that he did not believe Lopez was telling the truth "because he doesn't know and he can't remember because he never saw it." Counsel for Jimenez asserted that this went to the heart of the Confrontation Clause. He argued that if he knew Lopez's exact location, he could introduce obstructions that would show that Lopez did not have a clear view to Jimenez's porch and therefore could not have witnessed that to which he testified. In the alternative, Jimenez's counsel asked, since he could not confront the witness, that Lopez's testimony be stricken.

In an attempt to compromise, the court suggested that Jimenez's counsel ask the witness if he had an unobstructed view of the house, and counsel responded that the line of questioning would not sufficiently afford him the opportunity to impeach Lopez. Counsel contended that such questions assumed that he and the court trusted Lopez if Lopez answered that he had an unobstructed view. Counsel again urged that he be allowed to know Lopez's location so that he could then ask questions that would undermine Lopez's credibility as to his vantage point. Counsel argued that neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence gives "someone a privilege not to testify where they were."

The Government conferred with Lopez and then informed the court that Lopez confirmed that his location had been a residence–not parked on the street as he previously had testified–but that he did not want to reveal the identity of a confidential informant through his testimony. Therefore, the court ultimately ruled that Lopez could not be asked his specific location and, instead, defense counsel could ask Lopez how far he was from the house and whether he could see the front, side, or back of the house. Counsel asked the court to reconsider its ruling based on the Confrontation Clause and to allow him to test Lopez's memory. The court denied this request and ordered that the trial proceed.

Cross-examination then resumed, and counsel asked Lopez how far away he was from Jimenez's house. Lopez first answered, "I was real close at the location." Later, he answered that he was approximately ninety feet away. Lopez admitted that he was alone when he conducted the surveillance of Jimenez's house, and he did not take pictures or conduct a sound recording of the activities, record the license plate numbers of the vehicles, or later stop and question the individuals whom he allegedly saw buying drugs from Jimenez.

8

During Jimenez's testimony, this issue was also a primary focus. Jimenez's counsel showed her a rough sketch of her house and yard. Jimenez testified that her yard is neither large nor small and that there is a carport on the left side of the house and a large tree on the right side. She stated that she would have noticed, but did not do so, if any unusual cars were parked in front of her house either a few days before or on the day of the search. She was not sure, however, whether a person parked on the right side of the house out of her view would be able to see the house through the tree. She did state that someone on the left side of the house would not be able to see her front door because the carport would obstruct his view.

Jimenez also testified that at approximately 2:00 p.m. on the day of the search, Rodriguez's ex-girlfriend knocked on the door of her house and Rodriguez spoke with her on the telephone from inside the house for approximately five minutes while the ex-girlfriend stood outside on the porch and talked on her cellular phone. On redirect, Lopez testified that he did not observe a female arrive at the residence and remain outside talking on a cellular phone while he was maintaining surveillance of Jimenez's house on August 9, 2001. On re-cross examination, Jimenez's counsel asked Lopez where he was when he observed a female making a phone call in front of Jimenez's house. Lopez again responded that he did not see a female arrive at the house or make a call from the front porch of the house. When counsel repeated the question two more times, the Government objected, reiterating that Lopez's location went to the identity of a confidential informant. The court again sustained the objection, based on its earlier bench conference, and ordered the parties to cease this line of questioning.

After an in-depth review of the record, and specifically the events detailed above, we conclude that when the district court prohibited Jimenez's counsel from asking Lopez specifically where he was

9

located when he observed the activities at her front door, it violated Jimenez's Sixth Amendment right to confrontation. Lopez's testimony was critical to the Government's case, as he was the only witness who testified to seeing Jimenez distribute drugs. Lopez testified that he did not take photographs or a video recording of the activities, that he did not stop and question the supposed drug buyers, and that he did not record the license plate numbers of those individuals whom he suspected of purchasing drugs from Jimenez. Jimenez argues, and we agree, that the only way to test the reliability of Lopez's testimony regarding the activities on Jimenez's front porch is to determine where exactly Lopez was located when he saw these activities and then to pose questions that would tend to show that Lopez could not have seen the front door or those activities from his location.

The Supreme Court has noted that, "[t]he main and essential purpose of confrontation is . . . not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." *Davis*, 415 U.S. at 315-16 (internal quotation omitted). In *Davis*, defense counsel was restricted by state confidentiality provisions from questioning a witness about his juvenile criminal record, although such evidence might have affected the witness's credibility. The Supreme Court held that the Confrontation Clause was violated because the defendant was denied the right "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Id*. at 318. Additionally, in *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), defense counsel was precluded by the trial court from questioning a witness about the State's dismissal of a pending public drunkenness charge against him. The Court concluded, "[b]y thus cutting off all questioning about an event . . . that a jury might reasonably have

found furnished the witness a motive for favoring the prosecution in his testimony," the trial court's ruling violated the defendant's rights under the Confrontation Clause. *Id*.

Likewise, the jury in this case was not given an opportunity to form a thorough opinion regarding Lopez's motive or credibility. Accordingly, Jimenez was prohibited from "expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318. Therefore, we hold that Jimenez's Sixth Amendment right to effectively cross-examine Lopez was violated.

4. Was the Violation Harmless?

Once a court determines that a defendant's rights under the Confrontation Clause were violated, then it must determine whether the error was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id*. If a jury might reasonably have questioned the witness's reliability or credibility if cross-examination had been allowed, then the denial of the right to confrontation is reversible error. *Id*.; *Davis*, 415 U.S. at 317 (refusing to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted th[e] [defendant's] line of reasoning had counsel been permitted to fully present it" and concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding the proffered cross-examination).

Jimenez argues that several factors tip the scale in favor of us holding that the afore-analyzed Confrontation Clause violation is not harmless error. She asserts that Lopez's testimony regarding the activities on the front porch of her house was of primary importance to linking her directly to the

11

distribution of drugs. In fact, as Jimenez points out, Lopez's testimony was the *only* testimony regarding these activities. Furthermore, although perhaps his testimony could have been corroborated by the use of common police tactics, such as photographing, videotaping, or questioning the alleged purchasers, Jimenez points out that it was not. Finally, Jimenez testified that she would have noticed a strange car parked near her house; this contradicted Lopez's testimony that he was parked nearby.

On the other hand, the Government's argument on appeal does not focus on Lopez's testimony; it highlights other evidence in the record and asserts that the record as a whole should compel us to hold the error harmless. The government essentially directs our attention to the quantity of drugs, the presence of distribution paraphernalia, and Jimenez's admission that she knew her boyfriend sold drugs. We, however, disagree and hold that the overall strength of the prosecution's case is not enough to compel us to find that the Confrontation Clause violation in this case is harmless error. That the bulk of the evidence points toward illegal activity of some kind on Jimenez's part does not overcome the severe disadvantage that Jimenez had in attempting to rebut the Government's claim that she was an active participant in a drug distribution conspiracy.

Our responsibility in analyzing a Confrontation Clause violation is to look primarily at the specific testimony omitted, rather than the weight of the evidence notwithstanding the omitted testimony. *Fahy v. Connecticut*, 375 U.S. 85, 86 (1963) ("We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of."); *see United States v. Landerman*, 109 F.3d 1053, 1065 (5th Cir. 1997) ("Although there was sufficient evidence to convict [the defendant] without [the witness]'s testimony, that is not the appropriate inquiry.").

12

As mentioned previously, *Chapman* harmless-error analysis first requires us to "assum[e] that the damaging potential of the cross-examination were fully realized." *Van Arsdall*, 475 U.S. at 684. In doing so, we assume that, if Lopez's testimony had not been excluded in the trial court, his testimony would have potentially exposed to the jury (1) that his vantage point was inside of a residence rather than in a parked vehicle as he had previously testified; or (2) that his view of Jimenez's front porch was obstructed and, therefore, Lopez never actually witnessed Jimenez distributing the drugs. Based on the Government's assertions during the bench conference outside of the presence of the jury regarding Lopez's surveillance location, Lopez obviously did not wish to reveal to the jury certain details regarding his surveillance location.

Because this case turns wholly on reasonable doubt generated through witness credibility and specifically on the testimony of Lopez, we conclude that if counsel for Jimenez were allowed to effectively cross-examine Lopez, the potential result could have been damaging to the Government's case. Furthermore, considering the lack of physical evidence directly linking Jimenez to an intent to distribute narcotics– i.e., that Lopez did not photograph the alleged drug transactions or later arrest any of the persons he testified he observed purchasing drugs from Jimenez and that no direct fingerprint evidence tying Jimenez to the distribution paraphernalia was admitted into evidence–Lopez's testimony, and the lack thereof, was critical to the Government's case. In fact, Lopez's testimony is not just the Government's smoking gun; it is the Government's *only* gun. Accordingly, Jimenez should have been given the opportunity to conduct a complete cross-examination of the Government's key witness; at the very least, if Lopez's testimony had not been

excluded by the district court, Jimenez would have had the opportunity to create reasonable doubt regarding Lopez's credibility in the minds of the jury.[4]

In the final step of *Chapman* harmless-error analysis, the court looks to whether there is a reasonable probability that the evidence complained of might have contributed to the conviction. Such a determination "depends upon a host of factors." *Van Arsdall*, 475 U.S. at 684. Courts should consider the following factors to determine whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction: (1) "the importance of the witness' testimony in the prosecution's case"; (2) "whether the testimony was cumulative"; (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points"; (4) "the extent of cross-examination otherwise permitted"; and (5) "the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684; *see Landerman*, 109 F.3d at 1064 (5th Cir. 1997) (quoting *Van Arsdall*).

---

[4]Creating reasonable doubt in the minds of the jurors was a crucial trial strategy in this case, especially because the testimonies of Jimenez and Lopez conflicted in several substantial areas. For example: (1) Lopez testified that he saw Jimenez sell drugs on her front porch. Jimenez testified that she never sold drugs on her front porch. (2) Jimenez testified that Rodriguez's ex-girlfriend stood on the front porch of the house for five minutes during the time Lopez allegedly viewed the drug transactions. Lopez testified that he never observed the ex-girlfriend on the porch. (3) Lopez testified that he had a close (about ninety feet away), unobstructed view of Jimenez's front porch. Jimenez testified that obstructions flanked her house and she did not notice cars parked on the street during the time Lopez asserted that he conducted surveillance. (4) Lopez testified that Jimenez confessed to knowing the location of a firearm in the house but Jimenez testified that she never knew a gun was in the house. Because these testimonies cannot be reconciled, the key to this case is witness credibility rather than physical evidence. Thus, the fact that a full, unlimited cross-examination of Lopez could weigh heavily on his credibility in the eyes of the jury is relevant to our analysis under the first prong of *Chapman*.

14

Regarding the first consideration in the second prong of *Chapman* harmless-error anlysis, as we have noted, Lopez's testimony was critical and arguably the most important testimony given throughout the whole of Jimenez's trial. *Id*. at 1065 (vacating a conviction, notwithstanding significant corroborative evidence, because the "most damning testimony" came from a witness whom the defendants were not permitted to cross-examine properly.) Second, because Lopez's testimony is the only direct link to the intent to distribute portion of the charges against Jimenez, the testimony was not cumulative. Third, there is no corroborating evidence that Jimenez distributed the cocaine that was discovered inside of her residence. Lopez did not keep records or take pictures during his surveillance of Jimenez's house, nor did he arrest persons that he testified purchased drugs from Jimenez. Furthermore, as explained above, Lopez's and Jimenez's testimonies conflict. The fourth factor, the extent of cross-examination, is essentially the focus of Jimenez's entire appeal and, as we have explained, Jimenez's cross-examination of Lopez was very narrowly circumscribed by the trial court.[5] Regarding the fifth and final factor, the Government again argues quite vehemently that, because of the overall strength of its evidence, we should affirm Jimenez's convictions; however, we find this assertion by the Government overstated. The Government's evidence is substantial as to Jimenez's possession of cocaine, but that alone does not overwhelmingly prove that she distributed cocaine.

Lopez was the only witness to testify during trial as to the Jimenez's charges in the indictment. Lopez told the jury that he was approximately ninety feet from Jimenez's home when he observed

---

[5]The Supreme Court has cautioned that the defendant must be able fully to develop credibility issues. *See Davis*, 415 U.S. at 318 ("On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness . . . .").

people coming and going from Jimenez's home, leaving with "something small" handed to them by Jimenez. He also explained that ultimately, because of these observations, he secured a search warrant that led to the successful seizure of almost five kilograms of cocaine. Lopez's limited testimony, which is not corroborated by additional testimony and is in direct conflict with Jimenez's testimony and Rodriguez's confession, is the only evidence the Government proffered to support the charges in the indictment.[6]

Therefore, we hold that there is a reasonable possibility that the limitations placed on Lopez's testimony might have contributed to Jimenez's convictions, and we decline to interpret any adverse influence on the jury as harmless. *See Chapman*, 386 U.S. 24. Jimenez's constitutional right to put on an effective defense and confront those who testify against her outweigh the arguments made by the Government. The scales simply do not tip in favor of the Government on the facts before us. Thus, we hold that the violation of Jimenez's Confrontation Clause right was not harmless error. Accordingly, we vacate Jimenez's convictions and remand this case to the district court.

---

[6]Other circuits have similarly held this type of confrontation clause error to constitute reversible error. *See also Fowler v. Sacramento County Sheriff's Dep't*, 421 F.3d 1027, 1042 (9th Cir. 2005) (noting that the state's concession, that the "case was primarily a credibility contest between" the witness and the defendant, "alone strongly supports a finding that the error was not harmless"); *United States v. Schoneberg*, 396 F.3d 1036, 1044 (9th Cir. 2005) ("We cannot conclude that the error was harmless here, particularly because [the defendant] testified, and gave a logically possible and not implausible account."); *United States v. Chandler*, 326 F.3d 210, 225 (3d Cir. 2003) ("Because so much depended on the credibility of the cooperating witnesses [who provided the only direct evidence of the defendant's involvement in drug trafficking], additional information about their motives in testifying might have proven decisive."); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 (11th Cir. 1994) ("[T]he case came down to a credibility question between [the defendant] and the agents. Illumination of the circumstances surrounding [the agent's testimony] . . . might very well have affected the jury's credibility determination."); *United States v. Riggi*, 951 F.2d 1368, 1376 (3d Cir. 1991) ("[The witness] was a key witness for the prosecution, clean cut, college educated, and far more difficult to impeach than any other witnesses for the prosecution. It was important for the defense to neutralize [the witness]'s testimony. . . .").

16

## III. CONCLUSION

For the foregoing reasons, we VACATE Jimenez's convictions, finding that the limitations placed on the cross-examination of a key Government witness violated Jimenez's Sixth Amendment right to confrontation and that such a violation, in light of the evidence and testimony in this case, was not harmless. Accordingly, we REMAND for further proceedings consistent with this opinion.