**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 20, 2011

Lyle W. Cayce
Clerk

No. 09-60932

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PETER BERNEGGER,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Mississippi

Before WIENER, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:

Defendant, Peter Bernegger, appeals his conviction for mail and bank fraud. He also appeals his sentence of seventy months in prison and restitution of approximately $2 million. We AFFIRM as modified.

I.

Peter Bernegger and Stephen Finch were charged in a six-count indictment with various counts of mail fraud, wire fraud, bank fraud, and conspiracy for inducing investors to invest money in their two start-up companies, We-Gel and Citrus Products International (CPI). We-Gel purported

1

No. 09-60932

to make gelatin out of catfish waste, and CPI sought to make limonin out of lemon seeds.

Attempting to obtain capital for their new businesses, Bernegger and Finch held several meetings for potential investors, explaining their knowledge of the processes used to make gelatin and limonin out of waste products. One witness testified that Bernegger and Finch claimed there was nothing they did not know about these processes and that the gelatin was perfected and ready to be sold. Two witnesses testified that Finch said he and Bernegger had a contract with Nutri-West that was worth $3.2 million. Following these meetings, several individuals invested in both We-Gel and CPI.

Bernegger and Finch were never able to manufacture a sellable product, however, often pouring the results of their attempts in a ditch behind the plant. In fact, they were only able to make viable batches of the product a couple of times. As a result, We-Gel had no customers, and never made any sales. Nonetheless, Bernegger sent e-mails and letters to investors telling them how well things were going. Among other things, he told the investors that "We-Gel is producing product, shipping and invoicing customers," "we have contracted orders from 2 large customers totaling 3,000 metric tons per year," and We-Gel had "completely sold out of gelatin at a good price." He further told investors that the United States Navy had expressed interest in the process being used at We-Gel. David Cooper, an investor who also worked as a chemist with Finch and Bernegger, testified that he asked Bernegger why he did not tell the investors the truth in these letters, to which Bernegger replied, "They can't handle the truth."

Later, Bernegger mailed a letter to We-Gel investors asking for additional

2

funds "to finance [We-Gel's] accounts receivable" and asking each investor to contribute at least $25,000. In that letter, he noted that in order to "sweeten the pot," "a letter of intent has been signed with a Texas fish processing company named GAF." In a letter sent three days later, he said that GAF "is paying" We-Gel $1.2 million, which was purportedly "on top of the 50% of pre-tax profits from the second plant and is expected to be paid in about 4 months from now." Bernegger testified that he believed that We-Gel did have a letter of intent with GAF, pointing to an agreement We-Gel had with L&S Consulting, a company that hoped to broker a deal between We-Gel and GAF. That letter stated that "L&S is negotiating a deal with GAF such that GAF and We-Gel will form a 50-50 partnership for fish waste processing." The document was signed by Bernegger and Larry Mobley, a partner at L&S. Bernegger claimed that he believed Mobley was signing on behalf of GAF.

The jury heard testimony from GAF's general manager, GAF's executive vice president, and Mobley, each of whom testified that GAF never signed a letter of intent with We-Gel. The only document signed by GAF was a confidentiality agreement in anticipation of GAF's visit to We-Gel's plant. Although GAF employees did visit the We-Gel plant, they did not think the process was sufficiently developed to warrant doing business with We-Gel.

As a result of the letters Bernegger mailed, We-Gel obtained additional funding from some of its investors. One investor gave another $25,000 just days after receiving the second letter. Other investors did so shortly thereafter. At the end of February 2005, Donnie Kisner, who had invested $100,000 in CPI, called his relative, Leo Bieneck, to tell him what he had learned about We-Gel during the investor meetings. As a result of that conversation, Bieneck wrote

No. 09-60932

a check to We-Gel for $25,000. At the time of trial, none of the investors had received any return on his investment.

In addition to funding from his investors, Bernegger obtained grants of $250,000 each from both Clay County, Mississippi and the Mississippi Land, Water and Timber Board. Bernegger signed both a grant agreement and a security agreement with the state. As collateral for the security agreement, the state received the first and only lien on any equipment purchased with the money for five years. We-Gel was expected to meet certain other requirements, such as employing at least fifty-five employees after two years, turning in timely reports, and not selling the company. If We-Gel did not meet any of those obligations, the state could foreclose on the equipment.

A few months after signing the security agreement with the state, Bernegger sought a loan from BancorpSouth, hoping to pledge the same equipment as collateral. He sent the loan officer a letter with a list of equipment, valuing it at $1 million and stating, "We-Gel owns this equipment and it is paid for in full." The letter did not mention the state's security interest. We-Gel's office manager testified that, when Bernegger asked her to put together information about the equipment to give to the bank, she told him that the equipment was owned by the state. Asked what his response was, she said, "He kind of shrugged me off and told me not to worry about it. That, no, that was our equipment." Later, Bernegger took the loan officer on a tour of We-Gel and reiterated that it owned all of the equipment free of any liens. As a result, Bancorp agreed to issue a loan to Bernegger secured by the equipment.

As a condition of closing the loan with Bancorp, Bernegger gave the bank a lien on his home in Wisconsin, which was already the subject of three liens.

4

No. 09-60932

Before closing the loan with Bancorp, however, he borrowed $100,000 from another bank, pledging his home as collateral. Nonetheless, he signed an affidavit at the closing with Bancorp purporting to set forth all of the liens on the house, but omitting the new lien of $100,000. When Bancorp received the title opinion revealing the fourth lien, it refused to fund the remainder of the loan. Bancorp estimated its total loss from We-Gel at $125,000.

The indictment included six counts.[1] The jury acquitted Finch of the two counts against him and acquitted Bernegger of two of the five counts against him, but convicted Bernegger of mail fraud and bank fraud. Bernegger was sentenced to seventy months in prison and ordered to pay restitution of $2,100,000.

## II.

Bernegger makes several arguments on appeal, challenging both his conviction and his sentence.

## A.

Bernegger first contends that the district court erred in refusing to sever the bank fraud count from the mail and wire fraud counts. Under Federal Rule of Criminal Procedure 12(b), "objections based on defects in the indictment, as well as [r]equests for severance of charges or defendants . . . must be raised prior to trial." *United States v. Mann*, 161 F.3d 840, 861 (5th Cir. 1998)

---

[1] The indictment charged that: (1) Finch caused Larry Mobley to send a wire transfer of approximately $200,000; (2) Bernegger caused Craig Trebatowski to send via mail $100,000; (3) Bernegger caused Leo Bienek to send via mail $25,000; (4) Bernegger sent via mail a letter to all investors of We-Gel, his company, seeking additional cash investments based on several misrepresentations; (5) Finch and Bernegger conspired to commit wire and mail fraud, as set forth in the counts above; and (6) Bernegger committed fraud upon BancorpSouth, whose deposits were insured by the FDIC, by misrepresenting that certain equipment and property pledged as collateral was owned lien-free by We-Gel.

No. 09-60932

(internal quotation marks omitted).  Bernegger never moved to sever Count 6, however.  Instead, he points to a Motion to Sever filed under Federal Rule of Criminal Procedure 8(b), requesting that the district court "sever[] the case against him from that of the case of the Co-Defendant, Stephen Finch." Bernegger renewed that motion several times during the trial, but at all times he referred only to severing his case from that of his co-defendant.

Bernegger nonetheless asserts that his motion below preserved the issue because Rule 8(b) controls all severance motions in cases in which multiple defendants are tried, regardless of whether the movant is seeking to sever offenses or defendants.  Bernegger, however, never mentioned severing Count 6 in his motion to the trial court.  A defendant waives his offense-severance argument when he argues below only that severance of defendants was required yet maintains on appeal that severance of offenses is necessary.  *See Mann*, 161 F.3d at 861 n.58 (distinguishing motions to sever offenses from motions to sever defendants for preservation purposes).  Nor is this result changed by *United States v. Holloway*, 1 F.3d 307 (5th Cir. 1993), cited by Bernegger at oral argument.  There, the defendant moved to sever the charge of being a felon in possession of a weapon from his robbery offenses, citing Rule 14 but not Rule 8(a).  *Id.* at 309-10.  We held that the defendant need not cite the particular rule when his argument is made clear to the district court.  *Id.* at 310 n.2.  Critically, here, Bernegger neither cited the proper rule nor made his argument that the charges should be severed to the district court.  As a result, he did not preserve the issue, regardless of which rule controls.

Alternatively, Bernegger argues that this court should review the failure to sever for plain error.  When an appellant does not show cause for failing to

6

move for severance prior to trial, we need not address the merits of the severance argument at all, but we retain discretion to review for plain error. *Mann*, 161 F.3d at 862; *United States v. Tolliver*, 61 F.3d 1189, 1198-99 & n.6 (5th Cir. 1995), *vacated and remanded on other grounds*, 516 U.S. 1105 (1996). Even if we review for plain error, Bernegger is not entitled to relief. "The indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). The district court did not clearly err in finding that these offenses were of a similar character and constitute part of a common scheme—"the making of fraudulent misrepresentations for the purpose of funding his business venture."

Nor did Bernegger establish that any alleged error affected his substantial rights. He briefly argues that he was prejudiced because "the mere existence of the bank fraud invariably led the jury to assume the worst about Mr. Bernegger," which he says "explains Mr. Bernegger's convictions when Mr. Finch, who admitted lying to Mr. Bernegger and the investors, was acquitted of every count." He fails to note, however, that the court instructed the jury:

> A separate crime is charged against one or more of the defendants in each count of the indictment. Each count and the evidence pertaining to it should be considered separately. The case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate considerations to the evidence as to each defendant.

We have held that instructions almost identical to those given here are

7

sufficient to cure any prejudice from the joinder of defendants or offenses. *See Mann*, 161 F.3d at 862. Indeed, the jury followed those instructions: Bernegger was acquitted on two counts, as was Finch. As this court has previously said, "the acquittal of all the defendants on one or more counts 'supports the inference that the jury considered separately the evidence as to each defendant and each count.'" *Id.* (footnote omitted) (quoting *United States v. Faulkner*, 17 F.3d 745, 759 (5th Cir. 1994)). In sum, the district court did not commit plain error by not severing Count 6.

## B.

Bernegger next argues that the district court violated the Confrontation Clause of the Sixth Amendment when it denied him the opportunity to cross-examine Donnie Kisner, an investor in CPI, about an alleged discrepancy in his testimony. This claim is reviewed *de novo*, subject to a harmless error analysis. *United States v. Jimenez*, 464 F.3d 555, 558 (5th Cir. 2006). If no Sixth Amendment violation occurred, we review the limitations on cross-examination for an abuse of discretion. *Id.* at 558-59. We will not find an abuse of discretion "absent a showing that the limitations were clearly prejudicial." *United States v. Diaz*, 637 F.3d 592, 597 (5th Cir. 2011) (internal quotation marks omitted).

While the Sixth Amendment guarantees the right of a defendant to cross-examine witnesses against him, that right is not unlimited. *Jimenez*, 464 F.3d at 558. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [regarding a witness's motivation to testify] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van*

*Arsdall*, 475 U.S. 673, 679 (1986). "What is required is that defense counsel be 'permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" *Diaz*, 637 F.3d at 597 (quoting *United States v. Hitt*, 473 F.3d 146, 156 (5th Cir. 2006) (citation omitted)). To determine if a Sixth Amendment violation has occurred, we inquire into "whether the jury had sufficient information to appraise the bias and motives of the witness." *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993).

During cross-examination, Kisner revealed that he was involved in an ongoing project involving processing waste with David Cooper, an investor who had also worked as a chemist with Finch and Bernegger. Kisner testified that he had signed a confidentiality agreement and could not discuss it further, but Bernegger argued that he should be able to cross-examine Kisner on the details of the project:

> I think now that we know that this is a byproduct of food and Mr. Cooper is involved and Mr. Cooper was involved in CPI and We-Gel, I have good reason to believe that these gentlemen may have commandeered—that may be a strong word—or absconded—that's a strong word, too—with a project for which Mr. Bernegger may have had—may use and now may be processing that, the same set of facts that are before this Court and for which my client is being criminally prosecuted. I don't know that because I haven't heard what Mr. Kisner is going to say. But if that's the case, that is terribly relevant, Your Honor. In fact, that is not only relevant, it is material.

The district court excused the jury to take testimony under seal. During Bernegger's questioning outside the presence of the jury, Kisner testified that he was involved in a new project to process waste with Putnam Ethanol. He

further testified that his wife had signed the confidentiality agreement, contrary to his earlier testimony that he had done so. He testified, however, that he was bound by it. The district court determined that the new project and any alleged trade secret violation were not relevant to the fraud issues presented to the jury. Accordingly, the district court did not allow Bernegger to cross-examine Kisner on that particular issue in front of the jury.

Bernegger first argues that he should have been able to cross-examine Kisner about the fact that his wife actually signed the confidentiality agreement, contrary to Kisner's prior testimony. However, the record does not reflect that Bernegger's attorney ever sought to elicit that testimony before the jury. The district court did not prevent him from cross-examining Kisner about the discrepancy in his testimony. Alternatively, Bernegger argues that the district court's limitation on his cross-examination of Kisner was improper because Bernegger might have shown that Kisner stole a trade secret from him and used it in his new project, meaning that Kisner had an interest in seeing Bernegger convicted. Bernegger has not shown, however, that such testimony would have been relevant to whether he fraudulently obtained funding for CPI and We-Gel, or would have been more than marginally relevant to Kisner's credibility. Nor has he presented anything more than mere speculation that Kisner did in fact use one of Bernegger's processes improperly. Therefore, the district court gave Bernegger sufficient latitude during his cross-examination of Kisner, and there was no Sixth Amendment violation.

Because no Sixth Amendment violation occurred, we next review whether the district court's restrictions on cross-examination were so prejudicial as to result in an abuse of discretion. *Jimenez*, 464 F.3d at 558-59. Prejudice is

shown only if "a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning." *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004). For the reasons discussed above, Bernegger has not shown that the district court's limitations on cross-examination were prejudicial. The district court did not abuse its discretion.

## C.

Next, Bernegger contends that the district court erred by not granting a mistrial based on the format of the superseding indictment. Because he never asked the district court for a mistrial based on the indictment, we review for plain error. *See United States v. Potts*, 644 F.3d 233, 236 (5th Cir. 2011). Paragraphs 1 through 8 of the indictment, which were listed under the title "The Scheme" in Count 1, generally described the fraudulent scheme allegedly devised by Finch and Bernegger. Those eight paragraphs were then incorporated by reference in Counts 2 through 5. Following the general description of the scheme, the indictment contained another section, entitled "Execution of the Scheme," that laid out the specifics of Count 1—namely, that Finch had made misrepresentations to Larry Mobley, causing him to wire approximately $200,000 to We-Gel. Accordingly, while both Bernegger and Finch were identified in the first part of Count 1 describing the scheme, only Finch was actually charged with executing the scheme.

In Bernegger's view, the form of the indictment was confusing to the jury and justified a *sua sponte* mistrial. As the district court explained while discussing Count 1 at the charge conference, the jury charge adequately made clear that Bernegger was not charged in Count 1. Bernegger's counsel agreed:

11

No. 09-60932

THE COURT:    I think the instructions, as they are, are adequate. Mr. Daniels, you can't find him guilty if there's not a blank to fill in.

MR. DANIELS:    Right.

Bernegger's attorney then requested an additional curative instruction to clarify the point further, which the district court granted, instructing the jury:

> Now, ladies and gentlemen, I cannot emphasize enough to you that unless there is a blank here provided for that defendant, you cannot find that defendant guilty of that count, and the example that I'm giving you primarily deals with Count 1. Count 1 mentions—goes in great detail, you will have this superseding indictment back there, and Mr. Bernegger is mentioned, his name is mentioned in Count 1. But there is no provision for you to find Mr. Bernegger guilty of Count 1 of that indictment.

Bernegger received everything he requested from the district court to clarify the Count 1 issue.[2] The district court did not plainly err by not declaring a mistrial *sua sponte*.

## D.

In addition, Bernegger argues that insufficient evidence supports the jury's verdict on Count 3 of the indictment: that he caused Leo Bieneck to send $25,000 by mail. In addressing such an argument, this court views the evidence

---

[2] Relatedly, Bernegger claims that the district court erred "by not redacting [his name] from Count 1 of the indictment." This court reviews this claim for an abuse of discretion. *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993). The Federal Rules of Criminal Procedure provide that "[t]he Court on motion of the defendant may strike surplusage from indictment or information." Fed. R. Crim. P. 7(d). To strike surplusage, the language in the indictment must be "irrelevant, inflammatory, and prejudicial." *Graves*, 5 F.3d at 1550. In response to Bernegger's request that the district court remove his name from Count 1, the district court explained that doing so would deprive the jury of the context of the fraud. Bernegger has not established that the inclusion of his name in the indictment was "irrelevant, inflammatory, and prejudicial" and has not shown that the district court abused its discretion in refusing to strike the language.

and the inferences drawn therefrom in the light most favorable to the verdict. *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007). "Credibility determinations and reasonable inferences are resolved in favor of the jury's verdict." *United States v. Thompson*, 647 F.3d 180, 183 (5th Cir. 2011). The issue is not whether the jury correctly determined guilt, but whether it made a rational decision supported by sufficient evidence in the record. *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995).

To prove mail fraud, "[t]he Government was required to prove only a scheme to defraud, the use of the mail or wire communications, and a specific intent to defraud." *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010); *see* 18 U.S.C. § 1341. Contrary to Bernegger's contentions, the government is not required to prove that any misrepresentations were made directly to the victim. *McMillan*, 600 F.3d at 450. Bernegger argues first, that no fraudulent scheme existed, second, that there was no proof that Bieneck's check was mailed, and third, that there was no evidence that he had specific intent to defraud Bieneck or that he caused Bieneck to send the check.

First, there is sufficient evidence in the record to support a scheme to defraud. Bernegger argues generally that he intended to establish a legitimate business, that there was a large demand for gelatin, that Finch lied to him about being a doctor, and that the investors signed subscription agreements recognizing the economic risk of investing. As detailed above, the jury was presented with sufficient evidence that Bernegger made specific misrepresentations about contracts that We-Gel did not actually have, about a

letter of intent signed by GAF,[3] about how well production was going, and about the status of collateral he pledged for a business loan,[4] all with the goal of obtaining money to fund We-Gel. The jury was free to credit this evidence and disbelieve Bernegger, and there is sufficient evidence to support the jury's finding of a scheme to defraud.

Second, sufficient evidence supports the jury's finding that Bieneck's check was mailed. "When . . . it would be unusual for the transmittal in question to be made other than by mail, circumstantial evidence of the mailing is sufficient to support a mail fraud conviction." *United States v. Sprick*, 233 F.3d 845, 854 (5th Cir. 2000). Bieneck lived in Oklahoma; We-Gel received his check in Mississippi. The government points to the following testimony from Bernegger as an implicit admission that the check from Bieneck was mailed to We-Gel:

> Q. While we are on the subject of checks, Mr. Bieneck mailed you a check in February of '05 as well; is that correct?
> A. No.
> Q. That is not correct?

---

[3] Bernegger contends that the district court erred by failing to instruct the jury on the definition of "letter of intent." The district court denied that request because it was an improper instruction and the definition was more properly suited for attorney argument. This court reviews "a challenge to jury instructions for an abuse of discretion, affording the district court substantial latitude in describing the law to the jurors." *United States v. Ortiz-Mendez*, 634 F.3d 837, 839 (5th Cir. 2011) (internal quotation marks omitted). Bernegger has not established that the district court abused its discretion by denying the request.

[4] Bernegger makes similar arguments regarding the sufficiency of the evidence to support his convictions under Counts 4 and 6, that the government failed to establish beyond a reasonable doubt that he sent letters by mail to all investors of We-Gel seeking additional cash investments and that he committed fraud upon BancorpSouth by misrepresenting that certain equipment and property pledged as collateral was owned lien-free by We-Gel. For the reasons detailed above, there is sufficient evidence to support the jury's verdict on these counts.

A.      No.

Q.      You did receive a check from Leo Bieneck, correct?

A.      We-Gel did, yes.

Viewing the evidence in the light most favorable to the verdict, there is sufficient evidence that Bernegger used the mail for a fraudulent scheme.

Third, there is sufficient evidence that Bernegger caused Bieneck to send the check and that he had a specific intent to defraud. The jury heard testimony from Kisner that he relayed the information he had heard from Bernegger to his relative, Bieneck. It cannot be disputed that Bernegger's intent in sending the letters and holding the investors' meeting was to procure more investors. Kisner himself invested more money after receiving the letters from Bernegger, and he told Bieneck about We-Gel shortly thereafter. Bieneck mailed his check less than a month after Bernegger mailed the second letter. Sufficient evidence supports the jury's verdict that Bernegger's misrepresentations caused Bieneck to invest money in We-Gel.

E.

Bernegger also argues that the district court erred in denying his *pro se* habeas corpus petition. After the verdict, but before sentencing, Bernegger filed a habeas petition under 28 U.S.C. § 2255 raising, among other things, a claim for ineffective assistance of counsel. His trial counsel then moved to withdraw based on those claims. The district court denied both the habeas petition and the motion to withdraw, holding that the petition was not ripe, and we dismissed the appeal from the denial. A defendant cannot collaterally attack his conviction until it has been affirmed on direct appeal. *Fassler v. United States*, 858 F.2d 1016, 1019 (5th Cir. 1988). As a general rule, therefore, this

court declines to review ineffective-assistance claims on direct appeal. *United States v. Bishop*, 629 F.3d 462, 469 (5th Cir. 2010). The district court correctly determined that Bernegger's habeas corpus petition was not ripe for review.

## F.

Finally, Bernegger challenges his sentence, arguing that the district court improperly calculated the total loss caused by his fraudulent scheme as $2,196,296 and improperly ordered restitution in that amount. *See* U.S.S.G. § 1B1.3(a)(2). A district court's calculation of the amount of loss attributable to a defendant is reviewed for clear error. *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996). Bernegger asserts that the district court clearly erred by including in the total loss amount the loans he obtained from Clay County, Mississippi and the Mississippi Land, Water and Timber Board (the Timber Board), each for approximately $250,000. The pre-sentence report (PSR), which the district court adopted, included the amounts of these government loans in the total loss and listed Clay County and the Timber Board as victims.

Bernegger argues that, because he did not obtain the two loans criminally, the district court improperly included them in the total loss amount. It is well established that for "acts to constitute relevant conduct [for purposes of calculating the total loss attributable to the defendant], the conduct must be criminal." *United States v. Anderson*, 174 F.3d 515, 526 (5th Cir. 1999) (citing *United States v. Powell*, 124 F.3d 655, 665 (5th Cir. 1997)). "Before a court may attribute losses to a defendant's fraudulent conduct, there must be some factual basis for the conclusion that those losses were the result of fraud." *See also United States v. Randall*, 157 F.3d 328, 331 (5th Cir. 1998) (internal quotation marks and alterations omitted).

No evidence introduced either at trial or at sentencing demonstrated that Bernegger obtained these loans in a fraudulent or otherwise criminal manner. In fact, the government never even alleged that Bernegger acted criminally in obtaining the loans. While the PSR lists Clay County and the Timber Board as victims, it fails to allege any facts to support this conclusion. Although a PSR "may be considered as evidence by the court when making sentencing determinations," bare assertions made therein are not evidence standing alone. *United States v. Ford*, 558 F.3d 371, 376 (5th Cir. 2009). In the absence of evidence supporting its characterization of the loans, the PSR is inadequate to support the inclusion of the loan amounts in the loss calculation. *See Anderson,* 174 F.3d at 528-30; *see also Peterson*, 101 F.3d at 385. As such, the district court clearly erred in treating the amounts Bernegger borrowed from Clay County and the Timber Board as losses attributable to "relevant conduct" within the meaning of section 1B1.3(a)(2) of the United States Sentencing Guidelines.

Subtracting the amounts of the two government loans from the loss calculation does not affect Bernegger's offense level, however, and therefore does not affect his sentence. The district court calculated the loss attributable to Bernegger's fraud as $2,196,296.08. Only $471,296.08 of the total loss amount was attributable to the government loans. Under the Sentencing Guidelines, any loss amount between $1,000,000 and $2,500,000 yields the same 16-level increase. *See* U.S.S.G. § 2B1.1(b)(1). Thus, subtracting the loan amounts from the loss calculation, the correct total loss amount is $1,725,000, and Bernegger's offense level remains the same.

Because the district court clearly erred in calculating the total loss amount, however, the restitution amount is incorrect and must be modified. *See*

No. 09-60932

*United States v. Glinsey*, 209 F.3d 386, 395-96 (5th Cir. 2000). We therefore modify the restitution amount to reflect the correct total loss amount of $1,725,000.

## III.

Accordingly, the judgment of the district court is AFFIRMED as modified.