# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-50414

United States Court of Appeals
Fifth Circuit

**FILED**

June 24, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

CIRILO CHILO LARA MADRID,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:11-CR-3020

Before KING, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:*

Cirilo "Chilo" Lara Madrid appeals his criminal conviction and sentence after a jury found him guilty of conspiring to defraud the United States by procuring federal program funds through false pretenses and bribing an agent of a local government, in violation of 18 U.S.C. §§ 371, 666(a)(1)(A), (a)(2)

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-50414

(Count 1); bribery of an agent of local government, in violation of 18 U.S.C. § 666(a)(2) (Count 2); and conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341, 1346, 1349 (Count 3). Madrid was sentenced to 60 months in prison on Count 1, 120 months on Count 2, and 180 months on Count 3, all to run concurrently. The district court additionally ordered that Madrid pay $514,000 of restitution and, after a forfeiture hearing, ordered forfeiture of the proceeds of the conspiracy pursuant to 18 U.S.C. § 981(a)(1).

On appeal, Madrid contends that the district court erred in denying two pretrial motions: (1) his motion to dismiss on speedy trial grounds; and (2) his motion to compel production of the grand jury transcripts, which he alleges would reveal prosecutorial misconduct that may warrant dismissal of the indictment. Madrid also contends that the evidence was insufficient as to all three counts of conviction, that Count 2 was time-barred, that the district court made various erroneous rulings throughout trial regarding the admission or exclusion of evidence, that the judge improperly instructed the jury on conspiracy liability, and that the cumulative error doctrine requires reversal of his conviction. With regard to his sentence, Madrid asserts that the district court erroneously enhanced his criminal offense level under various provisions of the United States Sentencing Guidelines (U.S.S.G.), that his sentence is substantively unreasonable, and that the restitution and forfeiture orders imposed were founded upon clearly erroneous findings of fact.

We AFFIRM Madrid's convictions and sentences.

## I.

### A. Background

The criminal charges against Madrid all stem from his involvement in a six-year, approximately nine-million-dollar federal contract granted to El Paso County, Texas, to provide services to children with severe mental health

2

problems and emotional disturbances.  An El Paso collective entitled the Border Children's Mental Health Collaborative ("the Collaborative") sought and obtained a grant from the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the United States Department of Health and Human Services, to implement and sustain a system of services to provide comprehensive mental health treatment to children within the local El Paso community.[1]

The SAMHSA grant required El Paso County to make contributions to help fund the Collaborative's programming.  The County's contributions could be cash donations or "in-kind" contributions.  The option for the provision of an in-kind contribution, such as, for example, the donation of office space or services, encouraged the County to use its existing resources that had tangible value to support the Collaborative and its goals.  The provision of cash or in-kind contributions allowed the County to "draw down" federal funds under a "matching" system.  In other words, initially, SAMHSA provided the County with three dollars to "match" every one dollar of cash or one-dollar worth of in-kind services the County contributed towards the program.  As each year passed, SAMHSA would gradually provide less funds per dollar contributed by the County so that the County would gradually move towards financial sustainability without federal funding.

County Judge Dolores Briones was appointed as the "Principal Investigator" for the SAMHSA grant, which required her to oversee management of the grant.  Under Briones's leadership, there was a "governance team," also referred to as the "policy advisory group," which functioned in a similar manner as a board of directors.  The governance team

---

[1] Previously, children with severe mental health issues were treated at facilities outside El Paso County.  The Collaborative sought to bring those children back to their community and to locally provide services to these children and their families.

3

was led by Judge Alfredo Chavez. Madrid, formerly the executive director of Aliviane, Inc., a nonprofit substance-abuse program, was also a member of the governance team.

In addition to the governance team, the Collaborative was contractually required to have an "evaluation team" tasked with collecting data and reporting on the children and families enrolled in the program to ensure that the Collaborative was producing positive results for its target group. The evaluation team was required to survey families and children about their experiences and outcomes after receiving services through the Collaborative's program and to enter the collected data into a national database. A full-time evaluator with a Ph.D. or equivalent was required to manage the evaluation team. Further, SAMHSA required that the project have an "institutional review board" (IRB) approve its evaluation protocol.[2]

For the first three years of the Collaborative's contract—between 2002 and 2005—an organization called TriWest contracted with the County to carry out the evaluation team's functions. Despite TriWest's apparent success[3] in creating and implementing evaluation systems for the collaborative, in 2005, Judge Chavez expressed disappointment that TriWest had not created a

---

[2] An IRB is required to ensure that the confidentiality of the participants and their families is protected.

[3] Peter Selby, the co-principal of TriWest, testified that TriWest had experience successfully performing evaluation services for various grants conducted under SAMHSA in several states throughout the country. Selby testified that during the initial years of the Collaborative's grant his team created, *inter alia*, a "logic model" which is a "schematic" as to how the program would work, a "review matrix" for evaluating proposals from the care management arm of the Collaborative, a fidelity monitoring system to track what occurred during the provision of services, as well as a cultural competency tool. Selby also testified that over 90% of the participants enrolled in the Collaborative's program participated in TriWest's voluntary evaluation services.

4

No. 13-50414

sustainability plan[4] and, thereafter, directed that Requests for Proposal (RFPs) be issued to solicit bids for a new evaluation team contractor.[5]

The County received only two responses to the RFP—one from TriWest and one from LKG Enterpises, Inc.   Ruben "Sonny" Garcia—Madrid's codefendant who ultimately pleaded guilty and testified against Madrid—was the president and founder of LKG.  Despite LGK's limited experience working hands-on with children with serious emotional disturbances, its higher anticipated cost for provision of services as compared to TriWest's, and the potential interruption of evaluation services caused by a change in contractors, LKG was awarded the contract.  LKG's contract provided that it would be paid $50,000 per month for evaluation services and that LKG would submit monthly in-kind contribution reports equal to the $50,000 cost of evaluation services at no additional cost to the Collaborative.  Briones, as the "Principal Investigator" for the SAMHSA grant, signed the evaluation-service-provider contract between the County and LKG on November 1, 2005.

When initially planning for the execution of LKG's contract, Madrid suggested that Garcia speak with Jose Soria, the owner and sole employee of a corporation called Introspectives, Inc.[6]  Garcia approached Soria about the

---

[4] The Collaborative was required to develop a sustainability plan to ensure that when the federal funding would cease after six years, the County would have the systems and finances in place to continue the program. The evidence adduced at trial established that TriWest was not contractually obligated to create a sustainability plan and that, under the SAMHSA grant, it was ultimately the County's responsibility.  However, the evidence also suggested that LKG Enterprises, Inc., the evaluation team that took over the contract after TriWest, signed a contract indicating that they would create a sustainability plan.

[5] Chavez's directive to rebid for contractors circumvented the usual manner in which these decisions were made—namely, Chavez did not consult with or bring the issue to the attention of the governance team, nor were SAMHSA personnel timely notified that TriWest's contract was terminated.

[6] Madrid, who Garcia had a long-standing professional relationship with, advised Garcia regarding various aspects of LKG's work with the Collaborative from the beginning of this enterprise.  For example, Garcia testified that he consulted with Madrid while he was preparing LKG's response to the Request for Proposal.

5

contract and sustainability plan for the Collaborative, and, ultimately, on December 6, 2005, Soria drafted a contract between Introspectives and LKG, with an agreed upon monthly flat fee of $10,000.  The contract required Soria and his corporation, Introspectives, to conduct "quality insurance."  Soria was to provide, for example, "monthly reports, evaluation analysis, statistical comparative studies," and conduct electronic research to determine "different avenues for financial sustainability."  On December 14, 2005, eight days after LKG and Soria executed their contract, Soria contracted with Madrid to assist with Introspective's sustainability work.  The contract between Soria and Madrid provided that Madrid would perform "strictly sustainability" work in exchange for $150 an hour up to 100 hours a month, plus $500 per month for expenses.

As discussed more fully below, the government's evidence established that LKG did not perform on the contract, yet fraudulently represented via monthly invoices that it completed a total of $550,000 worth of work.  As a result of LKG's failure to uphold its contractual obligations, SAMHSA mailed Briones two letters in November 2006, informing her that the County had "materially failed to comply" with the terms of the grant, expressed concern about LKG's high contract price, and warned that LKG must obtain and maintain compliance with its contractual obligations in order for the County to continue receiving SAMHSA funding.  Ultimately, even after LKG proposed to significantly lower its fee, LKG's evaluation team contract was not renewed the following year.  The County instead awarded the contract to TriWest.

### B. The Bribe to Judge Briones

In the three or four months after LKG secured the contract with the County, Garcia and Madrid met with Briones at different local restaurants approximately four times.  Garcia testified that Madrid arranged for these

meetings with Briones.  During these meetings, Briones was "always asking" both of them for money for a new apartment and to help with the significant costs she was incurring to treat a serious health problem.  Garcia testified that it was "obvious" to him that in return for providing Briones with money, she would support the renewal of LKG's contract with the County.

After meeting with Briones several times, Madrid told Garcia that they were going to meet with Jan Zavala, Briones's longtime friend.  Zavala met with Garcia and Madrid twice, during which, according to her testimony, both men talked but Madrid "did a lot of the talking."  As a result of these meetings, Zavala signed a contract with LKG to complete "analytical work" for $3,000 a month.  Zavala agreed to provide $2,000 of each monthly payment to Briones and keep the remaining $1,000 for herself.  Garcia and Zavala both testified that Zavala never actually provided any data analysis, yet accepted monthly checks for $3,000, providing $2,000 per month to Briones. Garcia testified that contracting with Zavala was "just a way to give money to Dolores Briones" in exchange for Briones's support of the LKG contract.  Garcia mailed these monthly checks, with one exception,[7] to Zavala.

To corroborate Garcia's and Zavala's testimony, the government introduced evidence of phone logs demonstrating the telephone communications between Madrid, Zavala, and Briones.  The evidence indicated that Madrid received and returned multiple phone calls from Briones before and during the time LKG had the evaluation team contract with the County. The evidence additionally demonstrated that Madrid initiated contact with Zavala on December 19, 2005—around the time that Zavala agreed to accept the $3,000 monthly payments in order to funnel money to Briones.[8]

---

[7] The final check, dated December 21, 2006, was hand-delivered to Zavala by Garcia.

[8] The contract between Garcia and Zavala is dated November 1, 2005, but both Garcia and Zavala indicated that it was actually signed later than that.  Precisely when Garcia and

The government's evidence additionally established the various efforts Briones made to apparently uphold her end of the deal and support LKG's maintenance and renewal of the contract despite the company's noncompliance. For example, Briones made fraudulent statements to the El Paso County Commissioners Court ("Commissioners Court") regarding the work that LKG was conducting and misrepresented SAMHSA's level of satisfaction with LKG's provision of services. Specifically, the government presented the jury with recordings of Commissioners Court sessions in which Briones testified that the "Washington bunch was pleased" with LKG's results when in fact, SAMHSA officials were quite concerned about the lack of evaluation activity. Similarly, Garcia testified that he and Madrid met with Briones after SAMHSA conducted a site visit and expressed their concern about LKG's performance. Garcia testified that he, Madrid, and Briones discussed how Briones could intervene and, subsequently, Garcia and Madrid helped Briones prepare a responsive letter to SAMHSA that was meant to paint LKG in a positive light, despite severe performance issues. Further, when Donna Teague, the grant supervisor for the Collaborative, told Garcia that she would not sign off on one of the monthly checks to LKG until he provided documentation of their work, Garcia responded that he would talk to Briones. Shortly thereafter, Briones called Teague and instructed her to sign off on the check to LKG. Teague complied, believing that Briones had the documentation to support the invoice. Garcia testified that Briones was expected to intervene on LKG's behalf because of the money he and Madrid were providing her.

---

Madrid met and contracted with Zavala is unclear from the record, but the evidence suggests it was sometime between November and December 2005 and was "around the holidays."

8

At the end of 2006, Briones decided not to run for reelection, and, ultimately, Anthony Cobos was elected to take her place. Garcia testified that around December 2006, Cobos told him that if Garcia wanted his support for LKG's renewal of the contract, he would have to provide financial incentives. Thereafter, Madrid and Garcia, along with Soria and another individual, met with Cobos at a local restaurant and handed him envelopes of cash. Garcia testified that by paying Cobos this money, he expected to receive in return what they had received from Briones—support for renewal of the LKG contract. Madrid and Garcia subsequently met with Cobos at his private office to discuss contract renewal issues and thereafter helped Cobos prepare for the Commissioners Court session regarding LKG's performance problems and possible contract renewal.

## C. Conspiracy to Defraud the United States

The government presented evidence that LKG was noncompliant with various essential contractual obligations and effectively failed to complete any valuable work, yet received $50,000 monthly payments from the County by falsifying monthly invoices. The government's evidence established that LKG failed to hire and maintain a full-time Ph.D. on staff, as required by the SAMHSA contract, and lacked access to an IRB from November 2005 until March of 2006. Without an IRB's approval of its evaluation protocol, LKG was unable to submit data to the national database, as required under its contract. Accordingly, while an IRB was unavailable, children were provided services under the SAMHSA grant, but no corresponding data was collected or entered into the national database. After obtaining an IRB's approval, LKG submitted evaluation reports indicating that it collected data on approximately 167 children; however, Peter Selby, the co-principal of TriWest, testified that when TriWest returned as the evaluation team, as far as he and his team could see,

no data had been entered by LKG.  Likewise, in September of 2006, when SAMHSA conducted a site visit, Lisa Tomaka, who had recently resigned as the project director for the Collaborative, met with SAMHSA personnel to express her concerns that money was being provided to LKG without receipt of the agreed-upon services. Following the site visit, Michelle Herman of SAMHSA drafted a report indicating that there was an absence of evaluation activity data, writing that it appeared that "there was not much being done." At trial, Herman testified that as of November 21, 2006, there had been no data collection since September 30, 2005.

In addition to the lack of evaluation activity, the government's evidence established that Madrid, who, through his contract with Introspectives, was hired to conduct sustainability work under LKG's contract, failed to create the requisite "sustainability tool" and produced only a largely plagiarized sustainability report.  The sustainability report that Madrid ultimately provided to LKG, and that LKG in turn submitted to the Collaborative, was in large part copied from various publicly accessible Internet sources.  Moreover, the sustainability "plans" included in Madrid's report were duplicative of information already known to the Collaborative.  Although Madrid failed to demonstrate that he produced the work contracted for, he submitted nearly identical invoices each month, representing without documentation that he completed precisely 53.33 hours of work.[9]  As a result, Madrid received

---

[9] The government introduced Madrid's work logs, which indicated that for nearly every month, Madrid purported to work precisely 53.33 hours each month, which yielded a $8,000 monthly fee.  Madrid failed to provide any supporting documentation to verify the work he completed.  Soria would nonetheless write a check to Madrid for however many hours he indicated he worked.  Later, however, Soria tentatively testified that he "guess[ed]" he received the value of the work paid for.

payments totaling $99,600[10] through his contract with Introspectives—nearly all of the $110,000 that LKG paid Introspectives.

The evidence further established that Madrid and Garcia consistently made fraudulent representations regarding the in-kind contributions they provided. Tomaka testified that, during her tenure as project director, she reviewed LKG's monthly invoices reporting that it completed $50,000 of in-kind contributions a month, and found that the invoices were devoid of any supporting documentation or verification of any in-kind services LKG alleged it provided.[11] LKG's monthly invoices were each nearly identical, providing only that it furnished "professional services" and failed to establish that it actually contributed the in-kind services reflected in the invoices. In total, LKG represented that it provided in-kind services amounting to $550,000, without supporting documentation or data to substantiate the work it allegedly completed. The County relied upon LKG's representations regarding its in-kind contributions to "draw down" federal funds for the program.[12] Likewise, Madrid's in-kind logs, which Soria testified he never received, reflected that Madrid reportedly contributed exactly fifty hours of in-kind services each month, providing free work ten hours every Saturday of the month when there were five Saturdays in the month. When there were only four Saturdays in any given month, then Madrid's logs indicated that he would work ten hours each Saturday, and an additional ten hours the last Sunday of the month.

---

[10] After taxes, Madrid was paid a net total of $77,471.20 from Introspetives.

[11] When Tomaka asked for the information, it would sometimes be provided to her verbally or via email. Tomaka testified that despite communication with LKG, she never received enough information to substantiate the invoices.

[12] In total, the County claimed $1 million of in-kind contributions. Accordingly, LKG's unsupported invoices provided for over half of the in-kind contributions reported to SAMHSA.

Accordingly, each invoice reflected precisely $5,000 worth of volunteer in-kind services a month, without corresponding documentation or verification.

In addition, the government established that Madrid made various fraudulent representations in order to support the continuance of the LKG contract. For example, in a session before the Commissioners Court, Madrid falsely indicated that LKG had negotiated an offer for a substantial cash donation from Dr. Rodolfo Arredondo, the then-chairman of the Texas Department of State Health Services, who purportedly offered to donate between $300,000 and $500,000 to the Collaborative. However, Dr. Arrendondo testified at trial that he never offered, and was not authorized to offer, payment to the Collaborative.

Despite pervasive performance problems, by misrepresenting the work completed on monthly invoices, LKG received a total of $550,000 from the County under its contract. Based on the fees paid to LKG and the amount of LKG's reported in-kind contributions that the County relied upon to draw down federal dollars, the evidence established that the County lost a total of $1,100,000 as a result of its contract with LKG.

### D. Madrid's Defense

After the close of the prosecution's case, the defense unsuccessfully moved for a judgment of acquittal on all counts based on insufficiency of the evidence. The defense then called its only witness, FBI Special Agent Edward Dominguez. Through Agent Dominguez, the defense admitted a recorded conversation between Briones and Madrid that took place on June 25, 2010, during which Briones was wearing a wiretap, unbeknownst to Madrid. Briones informed Madrid that Zavala was contacted by the FBI, and, thereafter, Madrid and Briones agreed to meet in El Paso. At this informal meeting, in response to Briones's questioning about Zavala, Madrid stated to Briones that

No. 13-50414

he "didn't realize what the relationship was going to be between [Briones] and [Zavala]. . . . I was of the impression . . . that [Zavala] was crunching numbers." At trial and in his briefs on appeal, Madrid relied upon this recorded statement to argue that there was insufficient proof that he was actually aware of the bribery scheme.

After the conclusion of the eight-day jury trial, the jury convicted Madrid of all three counts. Madrid raises eighteen issues on appeal, which we address in turn.

## II.
## A. Pretrial Issues
### 1. Speedy Trial

Madrid contends that the district court erred by denying his motion to dismiss based on a purported Speedy Trial Act violation and that we, therefore, must vacate his conviction. We review the district court's legal conclusions regarding the Speedy Trial Act *de novo*, while its findings of fact are reviewed for clear error. *See United States v. Tannehill*, 49 F.3d 1049, 1051 (5th Cir. 1995).

Under the Speedy Trial Act, the government must "commence" the trial against a defendant who has entered a plea of not guilty within "seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The Speedy Trial Act, however, accounts for the fact that some cases may require more time to prepare for trial. *See generally Bloate v. United States*, 559 U.S. 196, 203 (2010) ("[T]he Speedy Trial Act . . . excludes from the 70–day period days lost to certain types of delay."). "[T]o provide the necessary flexibility, the Act includes a long and detailed list of periods of delay that are

13

excluded in computing the time within which trial must start. . . . Much of the Act's flexibility is furnished by § 3161(h)([7]), which governs ends-of-justice continuances." *Zedner v. United States*, 547 U.S. 489, 497-98 (2006).    An "ends-of-justice" continuance allows for the district court to toll the clock if it finds that "such action [serves the ends of justice and] outweigh[s] the best interest of the public and the defendant in a speedy trial."    18 U.S.C. § 3161(h)(7)(A).    When determining whether to grant an ends-of-justice continuance, the district court must consider various factors, including whether the case is "so unusual or complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Act]."    18 U.S.C. § 3161(h)(7)(B)(ii).

Here, the speedy trial clock began to run on January 1, 2012,[13] when the last codefendant in this multi-defendant case entered his waiver of appearance. *See United States v. Franklin*, 148 F.3d 451, 455 (5th Cir. 1998) ("[T]he speedy trial clock does not begin to run in a multi-defendant prosecution until the last codefendant makes his initial appearance in court."). Madrid acknowledges that, shortly thereafter, on January 10, 2012, the government filed a motion to designate the case complex and toll the speedy trial clock.    The district court undisputedly granted the government's motion to designate the case as complex on January 31, 2012, via a "text-only order."

---

[13] The district court's order denying Madrid's motion to dismiss on Speedy Trial grounds indicates that the January 1 date is undisputed; however, on appeal, Madrid contends that the clock commenced on January 5, 2012, and that the government contends it began on January 6, 2012. The disputed difference is immaterial here because we conclude, for the reasons stated herein, that the district court indefinitely tolled the speedy trial clock on January 31, 2012, at most thirty days after the clock commenced, and that, therefore, there was no Speedy Trial Act violation.

No. 13-50414

The district court's order is reflected in a January 31, 2012 docket entry that reads: "GRANTING 60 Motion to designate case complex."

Madrid contends below and on appeal that this "text-only" order was insufficient to actually toll the speedy trial clock because, pursuant to the district court's docket sheet, the order only indicates that it granted the government's motion *to designate the case complex,* and does not expressly grant the motion to *toll the speedy trial clock.*  As such, he contends that the clock was never tolled and the district court's order denying his motion to dismiss on Speedy Trial grounds erroneously "retroactively tried to characterize" the text order as an order that tolled the speedy trial clock.

The district court rejected Madrid's argument as "contrary to the plain language of the text order."  The district court explained that

> [t]he text order does not indicate that the Motion [] has been granted in part, or denied in part, but rather states that this is an 'Order GRANTING 60.'  The number 60 is hyperlinked to the 'Government's Motion for Designation as Complex Case and Tolling of Speedy Trial Provision,' docketed at ECP No. 60."  . . . The fact that the motion title is truncated [in the text-only order] holds no significance.  To enter a text order, the Courtroom Deputy selects the relevant motion from the CM/ECF case docket, and then clicks on a disposition option, . . . [and then the] system automatically generates a text order entry, which includes information identifying the motion at issue.

The district court thus found that the January 31 text-only order tolled the speedy trial clock until September 7, 2012,[14] when the court ordered a new

---

[14] Madrid alternatively contends that the government's January 10 motion only sought tolling of the speedy trial clock to the next "docket call," which was scheduled for February 3, 2012—just three days after the district court granted the government's motion. Madrid points to the government's proposed order, submitted as an attachment to its motion, which indicates that the speedy trial clock is tolled "between the filing of the Government's instant motion and the date set above for docket call is excludable." The proposed order then leaves a blank space, presumably for the court to fill in, to indicate when the speedy trial clock would recommence. Thus, Madrid argues, even if the text-only order did grant the government's motion to toll the speedy trial clock, that order only tolled the clock until

No. 13-50414

continuance and reset the trial date to allow Madrid additional time to review newly received evidence before trial.[15] In light of the docket entry indicating that the government's order to designate the case complex *and* toll the speedy trial clock was granted in full, we conclude that the district court's finding that it did actually toll the speedy trial clock by entry of the text-order is not clearly erroneous and thus must be upheld. Because the Speedy Trial clock was properly tolled from January 31, 2012, until the commencement of trial, Madrid has not demonstrated that his Speedy Trial Act rights were violated.

### 2. Disclosure of Grand Jury Transcripts

On December 14, 2011, Madrid was indicted on an 11-count indictment which included allegations that (1) all of the $3,000 checks LKG provided to Zavala were mailed to her using the United States Postal Service (USPS), including the check from LKG to Zavala dated December 21, 2006, and (2) the

---

February 3, 2012, the next docket call; therefore, he says, the Speedy Trial Act nonetheless was violated because over 70 non-excludable days passed between when the clock began to run again on February 3, 2012 and the commencement of trial on December 3, 2012. As the government argues, however, at the time it filed its motion to toll the speedy trial clock, the February 3 docket call date was already set and thus, had it meant to toll the clock only until the date of the next docket call, the government could have inserted that date in its proposed order. Madrid's argument does not demonstrate that the district court's finding that it tolled the speedy trial clock via text order to a date not certain, which allowed for continuance until September 7, 2012, was clearly erroneous.

[15] "[T]he Supreme Court has held that 'the Act is clear that the findings must be made, if only in the judge's mind, before granting the continuance,' and failure to make any express finding on the record cannot be harmless error." *United States v. Dignam*, 716 F.3d 915, 921-22 (5th Cir. 2013) (quoting *Zedner*, 547 U.S. at 506–07). "'[T]hose findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2).'" *Id.* Here, in its order denying Madrid's motion to dismiss based on speedy trial grounds, the district court adequately articulated its reasons for its January 31 order. The district court reasoned that it granted the continuance "due to the complexity of the case and the large volume of discovery . . . [and because, therefore,] the interest of justice would be served by granting the Motion to Continue, and that such ends of justice outweighed the interests of the public and Madrid in a speedy trial." "[B]ecause the district court 'set forth specific findings' that were made in the judge's mind before granting the continuance, its reasoning . . . satisf[ies] the requirements of § 3161(h)(7)(A)." *Id.* (citing *Zedner*, 547 U.S. at 507; *United States v. Hale*, 685 F.3d 522, 535 (5th Cir. 2012); *United States v. McNealy*, 625 F.3d 858, 863 (5th Cir. 2010)).

16

bribery of Briones was intended, in part, to assist LKG in fraudulently "obtaining" the contract to provide evaluation services under the SAMHSA grant. On July 27, 2012, after pretrial proceedings began, Madrid filed a motion for disclosure of grand jury transcripts, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii). In this motion, Madrid alleged (and supported his claims with documentary evidence),[16] that the government had reason to know before presenting its case to the grand jury that the December 21 check was not sent from LKG to Zavala via USPS but, rather, was hand-delivered by Garcia, and that Briones was not bribed to help LKG "*obtain*" the evaluation services contract, which was awarded on October 10, 2005, but rather that she was bribed on later dates to help "*maintain* and *renew*" the contract. Based on these facts, Madrid asserted that "someone in the government made these representations to the Grand Jury through sworn testimony." On August 15, 2012, however, before the district court ruled on the motion, the grand jury returned a 3-count superseding indictment. Counts 1 and 2 were substantively unchanged from the original indictment, but the superseding indictment, *inter alia*, omitted the allegations that the check to Zavala dated December 21, 2006, had been sent via USPS and, instead of alleging that Briones had been bribed to help "*obtain*" the evaluative services contract, averred that Madrid and Garcia had bribed Briones to "*maintain* the evaluation services contract . . . , support defendant LKG's participation in the

---

[16] Madrid attached FBI reports indicating that Zavala met with the FBI on April 10, 2010, and again on November 21, 2011, and at both times indicated that the December 2006 check was hand-delivered to her by Garcia. Despite the government's knowledge of this fact, the indictment indicates in both the introduction, and under the description of the actions that constitute Count 1, that Garcia mailed *all* checks to Zavala. Likewise, Madrid points to the FBI's reports regarding its interviews of Briones, which indicates that Briones "did not accept the money from Garcia and LKG in exchange for her vote [to *obtain* the contract]. . . . [She] accepted the money in exchange for helping LKG *keep* [the County's] evaluation contract." Accordingly, Madrid says, the documents suggests that the government knew that Madrid did not conspire to *obtain* the LKG contract.

[Collaborative,] [and] defend LKG's performance to SAMHSA." On September 5, 2012, the district court denied Madrid's motion to disclose the grand jury transcripts, concluding that "because the Government has filed a superseding indictment omitting the substantive mail fraud charges and the allegation that [Briones] assisted defendants in obtaining the contract, the issues raised are no longer relevant" and "[a]ccordingly," the motion "is DENIED as MOOT."

A district court's ruling on a motion to disclose grand jury transcripts is reviewed for abuse of discretion. *United States v. Miramontez*, 995 F.2d 56, 59 (5th Cir. 1993). "The proper functioning of the grand jury system depends upon the secrecy of the grand jury proceedings." *Id.* "The burden is on the party seeking disclosure to show that 'a particularized need' exists for the materials that outweighs the policy of secrecy." *Id.* The party seeking disclosure "must demonstrate that (1) the material he seeks is needed to avoid a possible injustice in another judicial proceeding, (2) the need for disclosure is greater than the need for continued secrecy, and (3) his request is structured to cover only material so needed." *Id.*

First, Madrid argues that without the incorrect allegation in the original indictment that the December 21 check was sent via USPS, that Count 3, charging him with conspiracy to commit mail fraud, would have been time-barred. Madrid correctly argues that because the relevant statute of limitations is five years,[17] he cannot be liable for criminal activity that was completed more than five years before the original indictment was returned on December 14, 2011. Consequently, he contends, because LKG's check to Zavala dated December 21, 2006, was hand-delivered and not mailed, and because all of the other checks mentioned in the indictment were mailed to Zavala before December 14, 2006, all of the mail fraud charges alleged in the

---

[17] 18 U.S.C. § 3282; *see United States v. Edelkind*, 525 F.3d 388, 393 (5th Cir. 2008).

No. 13-50414

original indictment are barred by the statute of limitations. However, as noted, the allegation as to the December 21 check to Zavala was deleted from the superseding indictment. Count 3 of the superseding indictment alleges three acts in furtherance of mail fraud crimes, all of which occurred after December 14, 2006, and within the limitations period. Specifically, Count 3 of the superseding indictment alleges that Madrid and his coconspirators caused to be sent via USPS "checks, letters, reporting documents and other correspondence as a result of and in support of the contract entered into between LKG and the County of El Paso" on December 31, 2006, January 31, 2007, and March 29, 2007.[18] These allegations as to the mailings on December 31, 2006, January 31, 2007, and March 29, 2007, were included in the original indictment and have been retained in the superseding indictment. Therefore, Madrid's assertion that, but for the inclusion of the erroneous allegation

---

[18] As the Supreme Court has explained, to establish a violation of 18 U.S.C. § 1341, "any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information[.]'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989)). "In addition, the defendant need not personally effect the mailing." *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014). "It is sufficient that the defendant 'cause' the mailing, or 'act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).

Here, Count 3 of the superseding indictment alleged that on December 31, 2006, the County mailed to SAMHSA the Fourth Year Annual Report, which included the County's calculations of the payments provided to LKG in exchange for evaluation services as well as the total in-kind contributions the County received. The report thus relied, in part, upon LKG's fraudulent representations regarding its in-kind contributions and services performed. Count 3 also alleges that on January 31, 2007, a letter concerning LKG's performance was mailed to LKG, and that on March 29, 2007, a letter cancelling LKG's contract was mailed to LKG, each via the USPS. The Annual Report relying upon false representations made by the coconspirators during the course of the conspiracy, as well as the letters concerning LKG's failure to perform under its contract and the eventual termination of the contract, are "incidental to the essential part of the scheme" to fraudulently obtain federal funds by false pretenses and thus suffice to establish the mailing element of Count 3. *See id.*

regarding the December 21 check to Zavala, all of the mail fraud charges against Madrid would have been time-barred is mistaken and without merit.

Second, Madrid contends that the denial of his motion to disclose the grand jury transcripts foreclosed him from moving to dismiss the indictment in its entirety based on the government's knowing presentation of perjured testimony to the grand jury—a claim he cannot substantiate without access to the grand jury transcripts.  He argues that if the judge had examined the grand jury testimony and discovered perjury, the entire indictment might have been dismissed, possibly with prejudice, thereby barring Madrid's prosecution. However, the mere fact that the original indictment may have erroneously set forth charges that the government would have been unable to prove—which required the corrections made by the superseding indictment—does not necessarily demonstrate perjury.  Rather than a sign of knowingly false testimony, the discrepancy may have been due to an unintentional drafting error.  Moreover, as a general rule, "[a]fter indictment, the judiciary's role in policing the credibility of witnesses before a grand jury is minimal."  *United States v. Strouse*, 286 F.3d 767, 771 (5th Cir. 2002).

As the Supreme Court decisions make clear, "the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *United States v. Williams*, 504 U.S. 36, 46 (1992) (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)) (footnote omitted). Because Madrid failed to allege or show a violation of any such clear rule in the present case, we conclude that the district court did not abuse its discretion in denying his motion.

No. 13-50414

## B. Trial and Conviction

## 1. Sufficiency of the Evidence

Madrid challenges the sufficiency of the evidence as to all three counts of conviction.  Because Madrid moved for a judgment of acquittal on all counts, he preserved the issue for appeal, and, therefore, we review his claim *de novo*. *See United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).  On review of sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) ("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.").

### a.  Count 1

The jury found Madrid guilty of Count 1, conspiring to defraud the United States and bribe Briones, pursuant to 18 U.S.C. §§ 371 and 666(a)(1)(A), (a)(2).  Madrid argues that there was insufficient evidence to convict him of conspiracy because the government failed to prove either of its two theories of guilt: (1) that there was a scheme to defraud the citizens of El Paso of the honest services of Judge Briones through the bribe of Briones; and (2) that Madrid conspired to obtain federal money and property by false pretenses.  Further, Madrid contends that there was insufficient evidence of an express agreement between him and the other conspirators and that the government failed to allege or prove that the United States was a target of the conspiracy to defraud, as he contends is necessary under 18 U.S.C. § 371.

No. 13-50414

### i.  Conspiracy to Bribe Judge Briones

Under 18 U.S.C. § 666(a)(2), it is unlawful to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, . . . or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."  Madrid contends that there was no evidence or testimony to support his conviction for the conspiracy to bribe Briones in violation of § 666(a)(2), because, he argues, there is no evidence that he and Garcia had an express agreement to bribe Briones or that he knew about the payments to her.[19]

To prove that Madrid was part of a conspiracy to bribe Briones, "the government must show '(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.'" *United States v. Richard*, 775 F.3d 287, 294 (5th Cir. 2014) (quoting *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010)).  "To be a conspiracy, an express, explicit agreement is not required; a tacit agreement is enough."  *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (quoting *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997)); *see also United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) ("The agreement

---

[19] Madrid points to the fact that Garcia mailed or hand-delivered to Zavala all the checks that were then used to pay Briones and that Garcia testified that he did not know whether Madrid ever expressly discussed with Briones the plan for Zavala to receive money from LKG that was intended for Briones.  Madrid additionally relies on Zavala's testimony that she "do[es] [not] remember" or does not have any "personal recollection" of whether she discussed paying Briones during the meetings that Madrid attended and, therefore, Madrid says, Zavala "denied" that the plan to funnel money to Briones was ever discussed in front of Madrid.  Madrid also cites the evidence that he told Briones during a secretly recorded conversation that he was "of the impression . . . that [Zavala] was crunching numbers."

between conspirators may be silent and need not be formal or spoken."). "A conspiracy may be proven with only circumstantial evidence or 'inferred from a concert of action.'" *Shoemaker*, 746 F.3d at 623 (quoting *United States v. Virgen–Moreno*, 265 F.3d 276, 284–85 (5th Cir. 2001)).

Despite Madrid's contentions to the contrary, the trial was not devoid of evidence of an intentional, knowing agreement between him and Garcia to bribe Briones. Rather, the jury was presented with strong circumstantial evidence of Madrid's concerted action with Garcia, Briones, and Zavala to conclude that he knowingly agreed to bribe Briones in exchange for her support of the LKG contract. Based on the evidence presented, the jury was entitled to "infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." *United States v. Thomas*, 690 F.3d 358, 366 (5th Cir. 2012) (internal quotation marks and citation omitted). Garcia testified that he and Madrid met with Briones several times during which she asked them for money and that it was "obvious" during those meetings that if they provided it to her, she would support LKG's contract. The evidence further established that, following those meetings with Briones, Madrid arranged the meeting between Zavala, himself, and Garcia—a meeting which the jury may rationally infer was a necessary first step to provide payment to Briones under the scheme. As a result of Madrid's arrangements, Zavala contracted with Garcia to perform data analysis for LKG, but never actually performed any services for LKG. Instead, she provided $2,000 a month to Briones from her $3,000 monthly checks from LKG. The jury rationally credited Garcia and Zavala's testimony—which was also corroborated by, among other things, the phone logs introduced at trial—to conclude that Madrid knowingly agreed with Garcia, Zavala, and Briones to provide Briones money, totaling $24,000, in exchange for her support of the

23

LKG contract.    Madrid's arguments that the evidence was insufficient to establish a conspiracy to bribe Briones are without merit.

### ii. Obtaining Federal Funds by False Pretenses

Madrid next contends that the government's evidence was insufficient for the jury to find that he was guilty of a conspiracy to obtain money and property from the United States by false pretenses, in violation of 18 U.S.C § 666(a)(1)(A).  Madrid argues that he had "nothing to do" with LKG's invoices or with the initial RFP application and, again, that there was no proof of an express agreement to make false representations on LKG's invoices.  Madrid additionally contends that the indictment failed to allege and the evidence adduced at trial failed to establish that he is a government agent, which he contends is required for a conviction under § 666(a)(1)(A).

Madrid's contention that there is no direct evidence that he agreed with Garcia, Soria, and Briones to submit false invoices to the County disregards the ample circumstantial evidence from which a rational juror could infer that he knowingly agreed to make false representations in order to continue receiving substantial funds under the contract with the County.   The government introduced evidence from which the jury could rationally conclude that LKG failed to perform on all aspects of their contractual obligations, yet submitted fraudulent monthly invoices to receive $50,000 per month for the work that they claimed was completed.  The evidence established that LKG's work in general and Madrid's work in particular was inadequate and did not meet SAMHSA's requirements, and that LKG's invoices and Madrid's work logs were wholly unsubstantiated.  From this and other evidence introduced at trial, the jury may rationally infer that Garcia, Soria, Madrid, and Briones agreed that LKG would submit invoices reflecting that they completed their work regardless of whether they actually performed on the contract in order to

collect $50,000 monthly.  The false representations on their invoices allowed Soria to procure $120,000 in total from his contract with LKG, $92,600 of which was then provided to Madrid.  The agreement likewise allowed Garcia and Madrid to funnel $24,000 to Briones through LKG's contract with Zavala.  In total, the government's evidence demonstrated that LKG, with Madrid's help, obtained $550,000 from the County despite its failure to perform under the contract.

Furthermore, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . .  If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *United States v. Nieto*, 721 F.3d 357, 368 (5th Cir. 2013) (quoting *Salinas v. United States*, 522 U.S. 52, 63-63 (1997)).  Accordingly, Madrid's argument that he was not directly involved in, for example, Garcia's submission of LKG's invoices does not render the evidence insufficient for the jury to conclude that he was a knowing member of the conspiracy to obtain federal funds by false pretenses.

Next, Madrid argues that he is not a "government agent" and thus a conviction for conspiracy to violate § 666(a)(1)(A) cannot be maintained against him.  Under the plain text of the statute, to be held criminally liable under 18 U.S.C. § 666(a)(1)(A), the defendant generally must be an "agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof." § 666(a)(1); *see also United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000) ("Under § 666(a)(1) and (b), the defendant must be 'an agent of an organization, government or agency' that receives in excess of $10,000 in a one-year period.").  "Section 666 broadly defines 'agent' as 'a person authorized to act on behalf of another person or a government and, in the case of an

organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.'" *United States v. Whitfield,* 590 F.3d 325, 344 (5th Cir. 2009) (quoting 18 U.S.C. § 666(d)(1)).  We have "held that for an individual to be an 'agent' for the purposes of section 666, he must be 'authorized to act on behalf of [the organization] with respect to its funds.'" *Whitfield*, 590 F.3d at 344 (quoting *Phillips*, 219 F.3d at 411).

Madrid is therefore incorrect to state that he must have "*government* agent status" to be liable under § 666(a)(1)(A).  Rather, he can be liable under § 666 if he is an agent of, *inter alia*, an "organization" that in any one-year period receives "in excess of $10,000 under a Federal . . . grant."  § 666(a)(1), (b).  *See also United States v. Brown*, 727 F.3d 329, 334 (5th Cir. 2013) ("In short, . . . there must be an individual who acts as an agent of an organization, the individual must have unlawfully obtained funds from this organization, and the organization must receive over $10,000 in federal funds in any one year period.").  Madrid does not dispute that he was a member of the Collaborative's governance team and that the Collaborative received "in excess of $10,000 a year under a Federal program involving a grant," § 666(b). The governance team functioned as a board of directors and collectively made decisions regarding the allocation of the federal funds.  As a member of the governance team, Madrid was authorized to participate in the decision-making process with respect to the expenditure of the Collaborative's funds.  We therefore conclude that Madrid was an "agent" for purposes of § 666.  *Accord Shoemaker*, 746 F.3d at 621 (holding that the defendant who was "authorized to act on behalf of [a hospital that received in excess of $10,000 a year from a federal grant] with respect to its funds" was an agent for purposes of § 666).

No. 13-50414

### iii.    Conspiracy to Defraud the United States

"By its terms, § 371 provides that the unlawful objective of the conspiracy may be 'to commit any offense against the United States,' i.e. to commit a federal crime, *or* 'to defraud the United States.'" *United States v. Mann*, 161 F.3d 840, 847 (5th Cir. 1998) (emphasis added).  Madrid argues that here the "defraud" clause of § 371 applies and that, in such cases, the "government must prove that the United States was the ultimate target of the conspiracy." *United States v. Mendez*, 528 F.3d 811, 815 (11th Cir. 2008).  Madrid argues that the indictment failed to allege, and that the evidence was insufficient to prove, that the United States was a target of the conspiracy to defraud under 18 U.S.C. § 371 and thus we must vacate Count 1.

Madrid's contention is factually imprecise.  Count 1 does not only allege a violation of § 371 under the "defraud clause."  Rather, the superseding indictment alleges both that Madrid conspired to "defraud the United States and any of its agencies" *and* that he conspired to violate laws of the United States—namely, §§ 666(a)(1)(A), (a)(2).  Accordingly, the jury was properly instructed to find Madrid guilty of Count 1 if it found that the government proved beyond a reasonable doubt any one of its three theories alleged under Count 1—either that Madrid conspired to defraud the United States, that he conspired to bribe an agent of a federally funded program in violation of § 666(a)(2), or that he conspired to obtain property from a federally funded program by fraud in violation of § 666(a)(1)(A).  In announcing its verdict, the jury expressly found Madrid guilty of all three alternative theories of convictions.  For the reasons already discussed, the evidence was sufficient to support the jury's verdict that Madrid conspired to violate § 666(a)(1)(A) and § 666(a)(2).  We therefore need not address Madrid's argument that the evidence was insufficient to demonstrate that he defrauded an agency of the

27

United States to conclude that the evidence was sufficient to convict him under Count 1.[20]

### b. Count 2

Madrid challenges the sufficiency of the evidence to support Count 2, the substantive bribery charge under 18 U.S.C. § 666(a)(2). Madrid again argues that there is no evidence tying him to Zavala's payments to Briones, citing the fact that it was Garcia who wrote and delivered the checks to Zavala and the absence of any direct evidence that Madrid knew about the payments to Briones. Madrid contends that the evidence proved only that Madrid suggested Zavala be involved as a potential "numbers cruncher," relying on the recorded conversation with Briones that he introduced into evidence.

As we concluded within our discussion of the sufficiency of the evidence as to Count 1, viewing the evidence in the light most favorable to the verdict, we conclude that it was reasonable for the jury to find that Madrid agreed with Garcia to give something of value to Briones with the intent of rewarding a local government agent. Although Madrid introduced evidence that he believed Zavala was simply a "numbers cruncher," the jury may have rationally credited the government's evidence of the bribery scheme over Madrid's recorded statement. The jury may have rationally inferred, for example, that when the recorded conversation occurred, Madrid already suspected he was under investigation by the FBI and therefore decided not to

---

[20] We nonetheless note that Madrid's argument that the evidence did not demonstrate that the United States or one of its agencies was a target of the conspiracy to defraud is belied by the record. Assuming without deciding that our precedent, like the Eleventh Circuit, requires that a conviction under the "defraud clause" requires proof that the "United States was the ultimate target of the conspiracy," *Mendez*, 528 F.3d at 815, the government here introduced ample evidence from which the jury could reasonably infer that Madrid was a participant in a conspiracy that intended to defraud a United States agency—SAMHSA. The evidence demonstrated that Madrid falsely represented that he and LKG completed the work necessary to continue receiving funding from the SAMHSA grant to procure federal funds by false pretenses.

make any incriminating statements that could have been overheard or reported to the government. Indeed, the meeting with Briones and Madrid was initiated because Briones notified him that Zavala had been contacted by the FBI. The jury therefore reasonably may have chosen not to give substantial weight to the statements Madrid made to Briones at a time when Madrid knew that at least one person involved in the bribery scheme was being contacted by the federal government. In sum, we hold that the evidence was sufficient to sustain the conviction for Count 2.

### c. Count 3

Count 3 charges Madrid with conspiracy to commit mail fraud, alleging that he used the USPS in furtherance of the conspiracy to knowingly defraud the County of money and property as well as the intangible right to honest services of a public servant, in violation of 18 U.S.C. §§ 1341, 1346, 1349.[21] "To prove mail fraud under 18 U.S.C. § 1341, the government must show: (1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014). As we have explained, to uphold a conviction for mail fraud "[i]t is sufficient that the defendant . . . 'act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id.* To prove Madrid conspired to commit mail fraud pursuant to § 1349, the government must show "(1) two or more persons made an agreement to commit an unlawful act; (2) the

---

[21] Section 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Madrid was charged under this section based on his participation in the conspiracy to bribe Briones, thereby depriving the citizens of El Paso of her honest services. Because we have already rejected Madrid's argument that the evidence was insufficient to convict him of a conspiracy to bribe Briones, we need only address the sufficiency of the evidence to convict Madrid for conspiring to commit mail fraud under §§ 1341, 1349.

defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014).

Madrid contends that the evidence was insufficient as to Count 3 based on the challenges he raised with regard to Counts 1 and 2, which we have already rejected and need not revisit. He additionally contends that the use of the mail was not foreseeable because everything sent via USPS was within the County and, presumably, could have been hand-delivered. Madrid also argues that the mailings which were sent and received from outside the County were not *in furtherance* of the scheme to defraud.

We conclude that the evidence was sufficient to support the jury's finding that the use of the mail was a reasonably foreseeable incident of the scheme to bribe Briones and to defraud the United States by procuring federal program funds by false pretenses. Specifically, the evidence demonstrated that all but one of the checks provided to Zavala were mailed via USPS and that Briones used USPS to uphold her end of the agreement by, for example, supporting LKG's maintenance and renewal of the evaluation team contract through mailed correspondence with SAMHSA personnel. Likewise, for the reasons explained *supra*, the evidence was sufficient for the jury to reasonably infer that Madrid knowingly conspired to fraudulently obtain funds from a federally-funded contract—a scheme that in the ordinary course of business would foreseeably require use of the mail to execute the plan, regardless of whether the local participants were located within the same county.[22]

---

[22] Madrid's conclusory statement that none of the mailings that traveled beyond El Paso County were in furtherance of the scheme to defraud is belied by the record. For example, Garcia testified that he and Madrid provided Briones materials to help her prepare a responsive letter to SAMHSA after their negative feedback following a site visit. Briones's letter was mailed via USPS. Garcia testified that Briones's letter purposefully painted LKG in a positive light in order to defend LKG and support the renewal of its contract—just as Briones agreed to do in exchange for the $2,000 monthly payments from Garcia and Madrid.

## 2. Additional Issues Regarding Count 2

### a. Statute of Limitations

Madrid next contends that the district court erred in denying his motion to dismiss Count 2 as time-barred. We review a district court's legal conclusions regarding the statute of limitations *de novo. See United States v. Irby*, 703 F.3d 280, 282-83 (5th Cir. 2012).

Madrid argues that he cannot be liable for criminal activity that was completed before December 14, 2006—five years before the original indictment was returned. The district court denied Madrid's motion to dismiss but limited the allegations in Count 2—the substantive bribery charge, alleging a violation of 18 U.S.C. § 666(a)(2)—to conduct that fell within the five years immediately preceding the return of the original indictment. Accordingly, the acts allegedly taken in violation of Count 2 were limited to the December 21, 2006, payment from Garcia to Zavala and the December 23, 2006, payment from Zavala to Briones. Madrid's argument that he cannot be liable for these acts because Garcia wrote and transmitted the checks to Zavala, is unavailing.

"Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator in furtherance of the conspiracy, even though that party does not participate in the substantive offense[.]" *United States v. Michel*, 588 F.2d 986, 999 (5th Cir. 1979) (citing *Pinkerton v. United States*, 328 U.S. 640, 647 (1946)). The jury found Madrid guilty of *conspiring* with Garcia and others to bribe Briones under Count 1. Garcia's foreseeable act in furtherance of that conspiracy which took place during the covered period—hand delivering Zavala a check in

---

Accordingly, Briones's letter was a reasonably foreseeable consequence of the bribery and the scheme to defraud the United States because it was mailed for the very purpose of perpetuating the illusion that LKG was satisfactorily completing its duties under the federally funded contract.

No. 13-50414

order to funnel funds to Briones—renders Madrid liable for the substantive criminal charge under § 666(a)(2) even if he did not himself participate in the physical act of delivering Zavala the check. *See, e.g.*, *United States v. Tilton*, 610 F.2d 302, 309 (5th Cir. 1980) (reasoning that the defendant "can be held responsible for the substantive offenses committed by the co-conspirators if acts were committed in furtherance of a conspiracy even though [the defendant] neither participated in the act . . . nor actually knew about it."). We therefore conclude that the district court did not err in denying Madrid's motion to dismiss Count 2 as time-barred.

### b. *Pinkerton* **Jury Instruction**

Madrid also challenges the district court's jury charge regarding Count 2, contending that the judge failed to adequately inform the jury that, under *Pinkerton*, he may only be convicted of crimes completed by his coconspirators where those acts were "*in furtherance* and as a foreseeable consequence of that conspiracy." *See* Pattern Jury Instructions: Fifth Circuit, Criminal Cases, §2.22 (2012) (emphasis added).

Madrid and the government dispute whether he preserved this issue for review and, thus, debate whether our review should be for an abuse of discretion or for plain error. Because we conclude that Madrid has not demonstrated reversible error under either standard of review, we will assume *arguendo* that Madrid adequately preserved the error and analyze the issue under an abuse of discretion standard. *See, e.g.*, *United States v. Richardson*, 676 F.3d 491, 506 (5th Cir. 2012).

Assuming *arguendo* that the district court's *Pinkerton* instruction here amounted to an abuse of discretion, any error in the jury charge was harmless and, therefore, does not require that we vacate Madrid's conviction on Count 2. *See generally United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007)

32

("An error in a jury instruction is subject to harmless error review.") (internal quotation marks and citation omitted).  As noted above, because of the five-year statute of limitations, the district court limited the acts charged under Count 2 to the payment from Garcia to Zavala on December 21, 2006, and the payment from Zavala to Briones on December 23, 2006.  With a proper *Pinkerton* charge, the jury would have been instructed to convict Madrid of Count 2, the substantive count charging Madrid with the bribery of Briones, only if it found beyond a reasonable doubt that these two monetary transactions were acts committed by Madrid's coconspirators in furtherance of the conspiracy.  The evidence overwhelmingly established that Garcia's purpose in hand-delivering Zavala the $3,000 check on December 21, 2006, and Zavala's delivery of $2,000 to Briones on December 23, 2006, was to funnel money to Briones to *further* the conspiracy to pay Briones in exchange for her support in the maintenance and renewal of the LKG contract.  Accordingly, assuming error in the district court's jury charge, based on our review of the record, "we are convinced that the error could not have affected the outcome of the case," *United States v. Montgomery*, 747 F.3d 303, 309 (5th Cir. 2014), and, therefore, any error in the *Pinkerton* charge is harmless.

### 3. Wyatt's Testimony

Michael Wyatt, an Assistant El Paso County Attorney who was the lead litigator in a civil lawsuit against Garcia and LKG for the very conduct involved in this suit, testified for the government regarding, among other things, what he uncovered about Madrid's educational background during his investigation of the conspiracy.  On appeal, Madrid contends that (1) allowing Wyatt's testimony with regard to Madrid's Ph.D. was improper under the Federal Rules of Evidence, and (2) the district court violated Madrid's Sixth Amendment right to confront witnesses against him and abused its discretion

33

when it limited counsel's ability to cross-examine Wyatt as to his potential bias.

### a. Wyatt's Testimony Regarding Madrid's Ph.D.

Wyatt testified that Madrid obtained a Ph.D., "but it was actually a degree from a degree mill." Madrid's counsel contemporaneously objected, contending that there was no predicate laid for the testimony and that it was merely Wyatt's opinion. The district court sustained counsel's objection, but Wyatt continued to testify that he conducted research into the online university where Madrid received his Ph.D., and that it is considered to be a degree mill. The district court overruled Madrid's further objections. Wyatt continued, "[the university] was investigated. A number of articles were written about it, that the individual who founded it wound up going to prison for tax evasion, and it was basically just a guy operating out of a store front." Madrid contends that the admission of this evidence violated the Federal Rules of Evidence and requires that we vacate his conviction.

"A district court's admission of evidence, if objected to, is reviewed for abuse of discretion." *United States v. Nelson*, 732 F.3d 504, 516-17 (5th Cir. 2013).[23] Even when the district court abuses its discretion by admitting inadmissible evidence, however, we must "view the error in relation to the entire trial[,] . . . determine whether the inadmissible evidence contributed to the jury's verdict and reversal is warranted only if the evidence had a

---

[23] Here, Madrid objected at trial to Wyatt's testimony as "hearsay" and argued that it "lacked a foundation." Despite the Government's arguments to the contrary, we conclude that this objection was sufficiently specific to properly preserve the issue. *See generally United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009) ("To preserve error, an objection must be sufficiently specific to alert the district court to the nature of the alleged error and to provide an opportunity for correction." (citing *United States v. Ocana*, 204 F.3d 585, 589 (5th Cir. 2000)). We will therefore conduct our review under the abuse of discretion standard. *See Nelson*, 732 F.3d at 516-17.

substantial impact on the verdict." *United States v. Wells*, 262 F.3d 455, 463 (5th Cir. 2001) (citations omitted).

Generally, a witness may not testify to a matter unless the witness has personal knowledge of it. Fed. R. Evid. 602. Here, Wyatt expressly conceded that his testimony was not based on personal knowledge but, rather, was based on information he learned by reading unspecified articles. Assuming without deciding that the admission of this testimony amounts to an abuse of discretion, we find no reversible error. The quality of Madrid's Ph.D. was not a substantial piece of evidence in the government's case and had little probative value as to the critical issues. Considering the record in its totality—which included testimony of a coconspirator and ample circumstantial evidence—we conclude that Wyatt's testimony about Madrid's Ph.D. did not have a substantial impact on the verdict and, therefore, any error in the admission of Wyatt's testimony about Madrid's Ph.D. was harmless. *Accord United States v. Gadison*, 8 F.3d 186, 192 (5th Cir. 1993) (finding harmless error where the improper admission of the defendant's prior conviction "added little to the government's case" as compared with "the detailed testimony of the two co-conspirators[] [and the] significant amount of strong circumstantial evidence").

### b. Limiting Cross-Examination of Wyatt

During defense counsel's cross-examination of Wyatt, Madrid's counsel elicited testimony that Wyatt was working on the civil suit against Garcia and LKG. Thereafter, Madrid's counsel questioned Wyatt about his assistance with the criminal prosecution. The government objected to defense counsel's question as to whether Wyatt sat at the government's counsel table during Garcia's guilty plea proceeding and the district court sustained the objection. The court also sustained objections to defense counsel's questions as to whether

Wyatt supplied the FBI with information for the criminal investigation or prosecution.  Madrid's counsel argued that this line of cross-examination goes towards the credibility of the witness and contended that he is allowed to impeach a witness with respect to bias.  Madrid argued that if he were permitted to present it, he had an email from Wyatt to the FBI, referring to the FBI agents by first name saying, "Hey here are some materials. . . . Please have Eddie look to see if he's interested."  Counsel argued that this evidence would allow the defense to argue that the prosecution was "borne by the county attorney's office."

Madrid contends on appeal that the district court's ruling that precluded Madrid from fully cross-examining Wyatt as to his bias and interest in the prosecution was an abuse of discretion and violated Madrid's Sixth Amendment rights under the confrontation clause.  "A defendant's right to cross-examine witnesses against him is a constitutional right secured by the Confrontation Clause of the Sixth Amendment." *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004).  "Alleged violations of the Confrontation Clause are reviewed de novo, but are subject to a harmless error analysis." *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004). "The Confrontation Clause is satisfied where defense counsel has been allowed to expose the jury to facts from which the jury 'could appropriately draw inferences relating to the reliability of the witness.'" *United States v. Heard*, 709 F.3d 413, 432 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 470.  If we conclude that "there is no Sixth Amendment violation, [we] [next] address[] whether the district court abused its discretion by limiting cross-examination." *United States v. Jimenez*, 464 F.3d 555, 558-59 (5th Cir. 2006).  "We will not find an abuse of discretion 'absent a showing that the limitations were clearly prejudicial.'" *United States v. Bernegger*, 661 F.3d 232, 237 (5th Cir. 2011) (quoting *United States v. Diaz*,

637 F.3d 592, 597 (5th Cir. 2011)).  "Prejudice is shown only if 'a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning.'" *Id.* (quoting *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004)).

Assuming *arguendo* that the district court violated Madrid's Confrontation Clause rights by limiting his ability to cross-examine Wyatt regarding his involvement and interest in the prosecution, we conclude that any error was harmless beyond a reasonable doubt.

> [A]ny violation of the confrontation right is subject to harmless error review by analyzing the following factors: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*United States v. Skelton*, 514 F.3d 433, 440 (5th Cir. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).  Balancing these factors, particularly the substantial weight of the evidence adduced against Madrid, outlined above, and the fact that Madrid was permitted to cross-examine Wyatt as to his involvement in the related civil litigation,[24] we conclude that any Confrontation Clause error was harmless beyond a reasonable doubt.  *See, e.g.*, *Skelton*, 514 F.3d at 443 (reasoning that, even if there was a Confrontation Clause violation, it would be harmless beyond a reasonable doubt because defense counsel was permitted to "explore the issue of bias" on cross-examination and the witness's testimony, although key to the prosecution's

---

[24] During cross-examination, Madrid elicited the fact that Wyatt was the lead attorney representing the County in the civil suit against Garcia and LKG and that the litigation was filed five years ago but is still pending, in part because of the ongoing criminal prosecutions.  Additionally, in an effort to diminish Wyatt's reliability, Madrid's counsel elicited testimony that some of the allegations in the civil indictment were inexplicably false.  Accordingly, the jury was aware of some facts from which they could reasonably infer Wyatt's bias.

case, was corroborated by two others); *United States v. Pryor*, 483 F.3d 309, 312-13 (5th Cir. 2007) (finding that, even if there were a Confrontation Clause error, it would be harmless beyond a reasonable doubt where "[t]he government's evidence against [the defendant] was substantial"). We likewise assume *arguendo* that the district court's limitation on Madrid's ability to cross-examine Wyatt amounts to an abuse of discretion, but, for the reasons discussed directly above, we cannot find that, had Madrid's counsel been able to pursue his line of cross-examination, the jury would have had a "significantly different impression of the witness's credibility," and, therefore, we conclude that any abuse of discretion was not prejudicial and does not warrant reversal. *Bernegger*, 661 F.3d at 239.

#### 4. Evidence Regarding the Judge Cobos Bribe

At trial, the government presented evidence that Garcia met with judge-elect Anthony Cobos several times about the renewal of LKG's contract with the County; that Cobos solicited money in exchange for his support of the LKG contract; and that Garcia and Madrid (and others) met with Cobos and provided him envelopes that contained cash. Madrid contends that the evidence regarding the bribe to Judge Cobos was improperly admitted under Federal Rule of Evidence 404(b) and irrelevant under Rule 403 because Madrid was "not on trial for any bribe of Anthony Cobos, and such a bribe is not mentioned at all in the superseding indictment." The government contends that this evidence was "intrinsic" to the criminal charges here in that it was "inextricably intertwined with the conspiracy," and thus is admissible and relevant. Alternatively, the government argues that, even if "extrinsic," the evidence was nonetheless admissible under Rule 404(b).

Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the [defendant's] character." *Huddleston*

*v. United States*, 485 U.S. 681, 685 (1988).  However, evidence of other "crimes, wrongs, or other acts," can be admitted, not to prove character, but to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b).  "The proper test to apply in deciding the admissibility of 'similar acts' or 'other acts' evidence depends upon whether the evidence in question is 'intrinsic' or 'extrinsic' evidence." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990).  Evidence is "intrinsic" when the evidence of the other act and the evidence of the crime charged are "inextricably intertwined," if both acts are part of a "single criminal episode," or if the other acts were "necessary preliminaries" to the crime charged.  *Id.*; *see also Turner*, 674 F.3d at 431.  "Intrinsic evidence is admissible to 'complete the story of the crime by proving the immediate context of events in time and place,' and to 'evaluate all of the circumstances under which the defendant acted[,]'" and thus does not implicate Fed. R. Evid. 404(b). *United States v. Carrillo*, 660 F.3d 914, 927 (5th Cir. 2011) (citations omitted). Comparatively, if the evidence is with regard to a "distinct and distinguishable event," then it is not intrinsic and we must then determine whether it was nonetheless properly admitted under Rule 404(b).  *See, e.g.*, *United States v. Nguyen*, 504 F.3d 561, 574 (5th Cir. 2007).

Here, we conclude that the evidence of Judge Cobos's bribe was intrinsic because it was "inextricably intertwined" with the conspiracy to defraud the United States in that it "complete[d] the story of the crime by proving the immediate context of events in time and place," allowing the jury to assess "all of the circumstances under which [Madrid and Garcia] acted." *Carrillo*, 660 F.3d at 927.  The government presented evidence that the bribe to Cobos was undertaken for the very purpose of continuing one of the conspiratorial objectives—fraudulently maintaining the LKG contract to obtain federal funds

by false pretenses. The evidence at issue demonstrated that Madrid and Garcia conspired to attempt to continue the conspiracy to unlawfully procure federal funds under the SAMHSA grant by bribing Judge Cobos for his support of the contract's renewal. This evidence therefore further established for the jury the "conspiratorial relationship" between Garcia and Madrid and, as noted, provided relevant contextual evidence regarding the nature and extent of the conspiracy. *See United States v. Watkins*, 591 F.3d 780, 784 (5th Cir. 2009); *United States v. Powers*, 168 F.3d 741, 749 (5th Cir. 1999) (holding that where "non-plead . . . actions tend to show the conspiratorial relationship between [the coconspirators], during the life of the conspiracy, . . . such 'other acts' are intrinsic to the Government's proof and not subject to Rule 404(b)"). The district court therefore did not abuse its discretion in admitting this intrinsic evidence.

### 5. Cumulative Error

In his last challenge to his conviction, Madrid contends that the cumulative error doctrine requires reversal of his conviction because the combination of the errors in his trial denied him his constitutional right to a fair trial. *See generally United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (en banc).

"'Cumulative error' justifies reversal only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *Delgado*, 672 F.3d at 344 (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007) (footnote omitted)). "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *Id.* (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc) (footnote omitted)). Here, although

we assumed *arguendo* that the district court erred with regard to the *Pinkerton* instruction, the admission of Wyatt's testimony regarding Madrid's Ph.D., and the limitation of defense counsel's cross-examination of Wyatt, these errors are not so pervasive that this court should conclude that the defendant received an unfair trial. *See, e.g.*, *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998).

## C.  Sentencing

Madrid was sentenced to 180 months' imprisonment and ordered to pay $514,000 of restitution, jointly and severally with LKG and Garcia. Additionally, Madrid was ordered to pay a fine of $100,000, an assessment of $300, and, after a hearing, the court ordered forfeiture of the proceeds of the offenses in the amount of $550,000.  Madrid was also sentenced to a term of three years' supervised release as to each count.  On appeal, Madrid contends that the district court made various improper enhancements under the United States Sentencing Guidelines (U.S.S.G.), that his sentence was substantively unreasonable, and that the restitution and forfeiture orders were based on clearly erroneous findings of fact.

### 1. Enhancements under United States Sentencing Guidelines

We review the district court's findings of fact for clear error and its legal interpretation or application of the U.S.S.G. *de novo.  See United States v. Claiborne*, 676 F.3d 434, 437 (5th Cir. 2012).

### a.  Loss over $400,000 Enhancement

The district court imposed a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H), for an intended loss in excess of $400,000.  The district court acknowledged that the fraudulent scheme involved $1,100,000—LKG's $550,000 contract fee plus the $550,000 of in-kind services LKG falsely represented it contributed—but limited its calculation to actual pecuniary loss, which it found was $550,000.  Madrid argues on appeal that (1) to calculate

loss, the court must make a finding as to the defendant's subjective intent, and the district court failed to do so here, and (2) the court erred in concluding that the actual loss was $550,000 because there is evidence in the record that LKG in fact provided some valuable services in return for the $550,000 contract fee.

"The application notes to § 2B1.1 state that for the purpose of this calculation, 'loss is the *greater* of actual loss or intended loss.'" *Nelson*, 732 F.3d at 520 (emphasis added). Here, the district court calculated loss under § 2B1.1 based on a determination of actual pecuniary loss to the County, and thus did not need to consider Madrid's subjective intent, which Madrid contends was the *lesser* of the two measurements. *Accord United States v. Schaffer*, 439 F. App'x 344, 346 (5th Cir. 2011) (unpublished) (explaining that it is "immaterial whether the intended loss was less than the actual loss because, in general, 'loss is the greater of actual loss or intended loss'" (quoting U.S.S.G. § 2B1.1)). Because the district court did not base the loss calculation on *intent*, but rather on actual pecuniary harm, Madrid's subjective intent is irrelevant.

Next, with regard to the district court's finding of fact that the actual loss to the County was the entire $550,000 the County paid to LKG under its contract fee, we conclude that this finding is not clearly erroneous and therefore must be upheld. The district court rejected defense counsel's arguments that LKG provided some work under the contract and, therefore, the actual pecuniary loss was not the full $550,000 provided to LKG, but, rather, that amount minus the value of their work. The district court stated on the record that it "spent a lot of time" reviewing its notes and the transcript and "could not find anything of benefit the county received" from LKG's

contract. The district court also adopted the findings of fact contained in the PSR,[25] which concluded, among other things, that

> investigating agents in this case discovered no evidence of services having been performed by LKG Enterprises for the county of El Paso, Texas, per LKG's contract. In addition, in a Victim Impact Statement submitted by El Paso County Judge Veronica Escobar on behalf of El Paso County, she indicated that El Paso County *received no benefits* from LKG.

These findings are consistent with the evidence adduced at trial.[26]

Although there is some evidence in the record that arguably suggests LKG performed in part under the contract, that evidence does not make the district court's factual finding that the County received no valuable benefit from the LKG contract clearly erroneous. For example, LKG's evaluation reports indicated that it collected data on over 100 children after its IRB was obtained. However, the evidence established that the data which LKG reportedly collected had not been entered into the national database and was not accessible to the Collaborative after LKG's contract was terminated. Likewise, Madrid points to the evidence demonstrating that he worked to help prepare a 1,000-page sustainability report for LKG. However, the evidence also established that Madrid's sustainability report was largely plagiarized and duplicative of information already available to the Collaborative, and that it did not meet the requirements of the SAMHSA grant. Moreover, Madrid does not assign a value to the work purportedly completed under the contract nor point us to any record evidence suggesting there was an actual pecuniary

---

[25] The district court properly adopted the PSR's findings of fact, as Madrid did not "present rebuttal evidence or otherwise demonstrate that the information is materially unreliable." *United States v. Jackson*, 596 F.3d 236, 243 (5th Cir. 2010).

[26] For example, Peter Selby testified that when he returned to his position as head of the evaluation team, he discovered that LKG had failed to enter any data during its tenure. Lisa Tomaka also testified that money was provided to LKG without any verification or documentation that any work or services had been provided.

value associated with this inadequate work completed under the contract. Accordingly, the district court's finding that $550,000 was the amount of the actual pecuniary loss is not clearly erroneous because it is plausible in light of the record as a whole. *See generally United States v. Lambright*, 320 F.3d 517, 518-19 (5th Cir. 2003). We therefore conclude that the district court did not err in imposing the fourteen-level enhancement based on its finding that the loss was in excess of $400,000.

### b. "Organizer or Leader" Enhancement under § 3B1.1(a)

Section 3B1.1(a) provides for a four-level enhancement if "the defendant was an organizer or a leader of a criminal activity that involved five or more participants or was otherwise extensive." The commentary to § 3B1.1 indicates that a court may consider various factors in making this determination, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4.

As noted *supra*, the government's evidence established that it was Madrid who arranged for the initial meeting between Garcia and Zavala and that, at the meeting, Madrid did most of the talking regarding Zavala's contract with LKG. The phone log evidence also suggested that Madrid had more frequent contact with Briones during the relevant time period than Garcia. Further, Garcia answered affirmatively when asked whether Madrid was "pulling the strings" and was the person who "put the team together" and helped make critical decisions, despite Garcia's title as the principal of LKG or his status as the "front man." The evidence therefore supports a conclusion that Madrid "possessed some decisionmaking power, participated extensively

44

in the crime, and exercised control and authority over his coconspirators." *United States v. Lage*, 183 F.3d 374, 384 (5th Cir. 1999).  The district court's finding that Madrid recruited others for participation in the conspiracy and that the enhancement was supported by the evidence is not clearly erroneous. Therefore, the district court did not err by imposing the four-level enhancement under § 3B1.1.  *Accord Brown*, 727 F.3d at 340 (finding that district court did not abuse its discretion in imposing an enhancement under § 3B1.1 where the defendants recruited others to join the conspiracy, even if they did not "conceive[] of or principally orchestrate[] the scheme").

### c.  "Position of Trust" Enhancement under § 3B1.3

Madrid challenges the two-level sentencing enhancement under § 3B1.3 based upon the district court's finding that he abused a position of public trust. Section 3B1.3 instructs that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  To impose an enhancement under this section, the district court must conduct a two-step inquiry:

> First, the court must determine whether the defendant occupied a position of trust at all.  If not, the inquiry ends and no enhancement accrues.  If, however, this initial query produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense.

*United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009).  With regard to the second prong, we have held that the person occupying the position of trust must use that position to "*significantly* facilitate the commission or concealment of the offense."  *Id.* (emphasis added); *see also* § 3B1.3 cmt. n.1 (explaining that "the position of public . . . trust must have contributed in some significant way to facilitating the commission or concealment of the offense").  In other words,

45

where an individual occupies a position of trust which is essential or "instrumental" to committing the offense, the enhancement applies. *See United States v. St. Junius*, 739 F.3d 193, 209 (5th Cir. 2013).

First, the record supports a finding that Madrid occupied a position of trust as the CEO of Aliviane and as a member of the Collaborative's governance team. *See, e.g.*, *United States v. Pruett*, 681 F.3d 232, 249 (5th Cir. 2012) (upholding enhancement under § 3B1.3 where defendant was the president and CEO of a company charged with violating the Clean Water Act). Second, as a result of Madrid's positions, he had access to influential members of the government and access to information regarding the inner workings of the SAMHSA grant, without which it would have been "extraordinarily difficult . . . to accomplish [the] criminal pursuits." *Id.* The district court therefore did not abuse its discretion by imposing this two-level enhancement.

### d. "Sophisticated Means" Enhancement under § 2B1.1(b)(10)(C)

Madrid's next argument with regard to the U.S.S.G. enhancements is that the district court abused its discretion in imposing a two-level enhancement for using "sophisticated means" pursuant to § 2B1.1(b)(10)(C). The commentary to § 2B1.1 indicates that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B).

Here, the district court explained that the means were "clearly sophisticated" because "there was a panoply of misrepresentations in this case that [Madrid] directly and indirectly took part [in]." The district court stated that, for example, the videos played for the jury regarding Madrid's testimony before the Commissioners Court reflects statements Madrid made to "cover[] this up." Additionally, the PSR, which the district court adopted, found that the "criminal enterprise involved the complicated process of submitting

46

proposals and bidding on a government contract, avoiding the risks associated with bribing a public official by diverting funds through a third party, and devising a plan to funnel payments to a . . . third party."

Madrid contends that these findings are clearly erroneous because there was no concealment of the funds used to funnel payments to Briones. Rather, LKG contracted with Soria, and then Soria contracted with Madrid, and each reported payments on tax forms submitted to the federal government. However, the evidence adduced at trial established that, despite the facially valid contracts between the parties, none of the coconspirators performed under the contracts and each coconspirator submitted fraudulent invoices in furtherance of the scheme to wrongfully procure federal program funds. Likewise, as the district court noted, Madrid and Briones made fraudulent statements in writing to SAMHSA and misrepresentations before the Commissioners Court. Such complex methods support the district court's plausible finding of fact that the offense involved complex or intricate conduct. *See, e.g., United States v. Beacham*, 774 F.3d 267, 277 (5th Cir. 2014) (upholding a sophisticated means enhancement where the defendant was convicted of wire fraud and bank fraud conspiracy based on, *inter alia*, the "different levels of people engaged in the fraud, . . . [and] the use of false [verification forms]"). We therefore conclude that the district court's imposition of the sophisticated means enhancement was not in error.

### e.  Multiple Bribes Enhancement under § 2C1.1(b)(1)

Madrid argues that the district court abused its discretion in imposing a two-level enhancement under § 2C1.1(b)(1) based upon its finding that "the offense involved more than one bribe or extortion" in light of the evidence regarding the bribes to Briones and Cobos. "The 'offense' referred to in section 2C1.1(b)(1) includes 'the offense of conviction and all relevant conduct under §

1B1.3 (Relevant Conduct)' . . . . Relevant conduct includes offenses that are part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Roussel*, 705 F.3d 184, 198 (5th Cir. 2013) (citation and quotation marks omitted). Madrid contends that the evidence regarding the bribery of Cobos is not "relevant conduct" and cannot form the basis of the enhancement.

For the same reasons that we held that the evidence regarding Cobos was intrinsic to the conspiracy to defraud a program receiving federal funds, we conclude that the district court did not err by imposing the two-level enhancement under § 2C1.1(b)(1). *See United States v. Barraza*, 655 F.3d 375, 385 (5th Cir. 2011) (holding that where "two briberies involved similar modus operandi, a common purpose, and occurred in close temporal proximity[,] . . . [the two] briberies were part of a common scheme or of the same course of conduct [and therefore], the second uncharged bribe may be used to increase the offense level for [the defendant's bribery conviction").

## 2. Substantive Reasonableness

Madrid argues that his 180-month prison term is substantively unreasonable in light of: his age, and specifically, because he was 68 years old at sentencing, the sentence amounts to life imprisonment; his lack of criminal history; his service in the Army and to the community; and because the sentence is disproportionately high in comparison to the other coconspirators' sentences. Madrid raised these points at sentencing and the district court considered his arguments. The district court noted the severity of the crime at issue and that Madrid's coconspirators' sentences were less severe because they cooperated with the government and pleaded guilty. The district court then found that the U.S.S.G. recommended range of 235-240 months imprisonment was "excessive," and that sentence below the recommended

range would suffice for deterrence purposes and the other sentencing goals of 18 U.S.C. § 3553(a).  Madrid was then sentenced to 180-months in prison, 55 months less than the bottom of the recommended U.S.S.G. range.

"On appeal, the district court's sentence is reviewed for reasonableness under an abuse-of-discretion standard."  *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013).  To demonstrate that the district court abused its discretion in applying the § 3553(a) factors, Madrid must show "that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors."  *Heard*, 709 F.3d at 424-25.

After consideration of the "totality of the circumstances, including the extent of any variance from the Guidelines range[,]"  *United States v. Fraga*, 704 F.3d 432, 439-40 (5th Cir. 2013) (internal citation and quotation marks omitted), we conclude that Madrid has not demonstrated that the district court's below-Guidelines sentence constitutes an abuse of discretion.  First, with regard to Madrid's argument that his sentence is unreasonable because it is disproportionately high as compared to Garcia's and Briones's sentences, we conclude that this contention is without merit.  Madrid rightly notes that his sentence is substantially longer than Garcia's 48-month sentence and Briones's 30-month sentence.  Pursuant to § 3553(a)(6), district courts shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Here, the district court expressly considered this sentencing factor and found that there was a warranted, reasoned basis for the differences in sentences among the coconspirators: Briones and Garcia cooperated with the investigation and pleaded guilty to the charges.  We cannot conclude that the district court abused its discretion in finding that the disparity between

49

Madrid's and his coconspirators' sentences was warranted here and, thus, the disparity does not render his sentence substantively unreasonable. *See, e.g.*, *United States v. Garcia Mendoza*, 587 F.3d 682, 688 (5th Cir. 2009) (finding that the district court properly imposed a within-Guidelines sentence despite disparities among the codefendants' sentences because, *inter alia*, some codefendants received reduction in sentences for their cooperation with the government).

Next, with regard to Madrid's argument that the district court failed to give adequate weight to his age and background, the record reflects that the district court considered these mitigating factors, as well as the need for deterrence and the nature of the offense, and imposed a below-Guidelines sentence, recognizing that the Guidelines range was "excessive" in this particular case. There is no evidence on the record that the district court failed to account for a relevant factor, gave significant weight to an improper factor, or made a clear error in judgment. *See Fraga*, 704 F.3d at 439-40. "In essence, [Madrid] is asking the court to reweigh the § 3553(a) sentencing factors. As we have previously held, '[a]ppellate review is highly deferential as the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) with respect to a particular defendant.'" *Heard*, 709 F.3d at 435 (quoting *United States v. Campos–Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008)). Accordingly, we hold that the district court's below-Guidelines sentence is not substantively unreasonable.

### 3. Restitution

Madrid contends that the district court clearly erred in finding that the County received no benefit from the LKG contract and thus erroneously awarded restitution in the amount of $550,000 (which was thereafter amended to $514,000 to account for the amount of restitution that Briones was required

to pay).   Madrid incorporated his arguments regarding the district court's finding of intended loss—*i.e.*, that the evidence established that the County did receive some benefit from LKG's work under the contract and thus the evidence does not support the district court's finding that the entire contract price was lost.  Madrid cites *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012), for the proposition that "every dollar [of restitution] must be supported by the record evidence," and contends that the record does not support each dollar of the restitution award here.

"We review 'the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion.'"  *United States v. Beacham*, 774 F.3d 267, 278 (5th Cir. 2014) (footnote and internal citations omitted). "The district court 'abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.'" *Id.*  Although the district court is required to make findings of fact to support each dollar amount of restitution, the district court's findings of facts are reviewed for clear error and thus not reversible on appeal unless the district court's finding is implausible in light of the record as a whole, or in other words, the court is "left with the definite and firm conviction that a mistake has been committed."  *Sharma*, 703 F.3d at 322.

For the reasons discussed above, although there is some evidence suggesting LKG did some amount of work during its tenure as the evaluation team, the evidence, as the district court found, nowhere establishes what financial benefit, if any, the County actually received from any of LKG's sustainability or evaluation work.  The district court's finding of fact that the actual pecuniary loss as a result of the scheme was the entire cost of the LKG contract, $550,000, is not clearly erroneous and does not amount to an abuse of discretion.

Madrid additionally contends that the district court erred in finding that restitution be paid to SAMHSA because restitution must only go to victims directly and proximately harmed by the defendant's offense.  Madrid argues that, at the time that the PSR was written, SAMHSA has not sought reimbursement from the County because nothing needed to be returned to the federal government and thus ordering restitution to be paid to SAMHSA was in error.  Here, the evidence demonstrated that SAMHSA provided the funds for the costs of evaluation services under the County's contract, and thus SAMHSA is properly considered a victim for purposes of restitution.  *Accord United States v. Caldwell*, 302 F.3d 399, 419-20 (5th Cir. 2002) (concluding that the state of Mississippi is a "victim" for purposes of restitution where the evidence supported a finding in a mail fraud prosecution that the defendant defrauded a corporation "created by state statute and funded by state bonds").

### 4. Forfeiture

Madrid raises the same factual arguments regarding the forfeiture order, contending that the district court clearly erred in ordering forfeiture in an amount reflecting the entire proceeds jointly procured by the coconspirators—$550,000.  "This court reviews 'the district court's findings of fact under the clearly erroneous standard, and the question of whether those facts constitute legally proper forfeiture *de novo.*'" *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005) (quoting *United States v. Marmolejo*, 89 F.3d 1185, 1197 (5th Cir. 1996)).

"Forfeiture[] . . . is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity." *United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009) (quoting *United States v. Webber*, 536 F.3d 584, 602-03 (7th Cir. 2008)); *see also Read*, 710 F.3d at 231 ("While restitution represents a victim's loss from the defendant's offense, forfeiture represents

the defendant's gain from the offense.") (citations omitted).    Generally, "[c]riminal forfeiture focuses on the disgorgement by a defendant of his 'ill-gotten gains[,]'" and thus a forfeiture order must reflect the profits procured by the defendant. *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012). However, "[t]his general rule is somewhat modified by the principle that a court may order a defendant to forfeit proceeds *received by others who participated jointly* in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant." *Id.* at 147 (emphasis added).

Here, after a forfeiture hearing, the district court found that LKG provided no quantifiable service or benefit to the County under the terms of the contract and, therefore, the proceeds of the offense were $550,000—the entire LKG contract price.    For the reasons already explained, the record evidence supports the district court's finding that the coconspirators jointly profited the entire $550,000 received from the County, and that the receipt of the $550,000 was a reasonably foreseeable result of the conspiracy. Accordingly, the district court's findings of fact supporting its forfeiture order were not clearly erroneous and the district court did not err in imposing a $550,000 forfeiture order.

## CONCLUSION

For these reasons, we AFFIRM Madrid's convictions and sentence and AFFIRM the restitution and forfeiture orders.